**NOT FOR PUBLICATION** **CLOSED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
ROBERT V. BAER,                         :
                                        :
        Plaintiff,                :
                                        :     Civil Action No. 02-2334 (JAP)
        v.                        :
                                        :     **OPINION**
DAVID CHASE, DC ENTERPRISES,            :
INC., a Delaware Corporation, and       :
JOHN DOES A-Z,                          :
                                        :
        Defendants.               :
_____:

APPEARANCES

ROBERT V. BAER, Esq.
4 Laurel Road
Wayne, NJ 07470

LAW OFFICES OF HARLEY D. BREITE
Harley D. Breite
562 Black Oak Ridge Road
Wayne, New Jersey 07470

MICHAEL S. KASANOFF, Esq.
157 Broad St.
Suite 321
P.O. Box 8175
Red Bank, NJ 07701
    Attorneys for Plaintiff

LOWENSTEIN SANDLER PC
Peter L. Skolnik
Michael A. Norwick
Matthew Savare
65 Livingston Avenue
Roseland, New Jersey 07068
    Attorneys for Defendants

PISANO, District Judge.

This case returns to the Court following a remand from the Court of Appeals solely to resolve Plaintiff's quasi-contract claim. Before the Court is Robert Baer's ("Plaintiff") motion for partial summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"). Plaintiff argues there is no genuine issue of material fact concerning the timeliness of his quasi-contract claim. David Chase ("Chase") and DC Enterprises, Inc. (together with Chase, "Defendants") bring a renewed motion for summary judgment pursuant to FRCP 56(c), in which they argue that the quasi-contract claim remains barred by the statute of limitations and that the claim fails because Chase was neither conferred a benefit nor unjustly enriched. The Court has jurisdiction pursuant to 28 U.S.C. § 1332, and resolves this matter without oral argument as per FRCP 78. For the reasons expressed below, the Court grants summary judgment in favor of the Defendants and dismisses the quasi-contract claim with prejudice.

**I. Factual History**[1]

At the heart of this case is the creation and development of the well-known television series, *The Sopranos*. By all accounts, *The Sopranos* has received critical acclaim, popularity, and financial success. Through this lawsuit, Plaintiff seeks credit and compensation for what he perceives as his role in the creation and development of *The Sopranos* pursuant to an alleged oral contract between him and Chase, the creator, producer, writer, and a director of the show. According to Plaintiff, he and Chase orally agreed on three separate occasions that if the show

---

[1] As the facts have not changed and no genuine issue of material fact remains on the underlying case, the Court adopts the facts as presented in its prior opinion. *Baer v. Chase*, Civ. Act. No. 02-2334, 2004 WL 350050 (D.N.J. Feb 20, 2004).

was a success Chase would "take care of" Plaintiff and "remunerate [Plaintiff] in a manner commensurate to the true value of [his] services." This agreement is the basis of Plaintiff's legal action.

### A. Underlying Case

On or about May 15, 2002, Plaintiff filed a verified complaint in this Court; thereafter, on May 2, 2003, Plaintiff filed an amended verified complaint (the "Complaint"). The Complaint alleged: (I) breach of contract; (II) breach of implied contract; (III) breach of quasi-contract; (IV) common law fraud; (V) equitable fraud; (VI) negligent misrepresentation; (VII) breach of fiduciary duty; (VIII) unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125; (IX) unfair competition and misappropriation under N.J.S.A. 56:4-1; and (X) tortious interference with prospective economic advantage. Plaintiff subsequently withdrew Count VIII and Count IX, in part. The Defendants timely filed answers to each complaint and subsequently moved for summary judgment on the entire Complaint.

It should be noted at the outset that the Court finds there are no genuine issues of material fact. To the extent that some of the facts discussed below are in dispute, the Court finds that they are immaterial to the outcome of this case.

Originally from New Jersey, Chase relocated to Los Angeles in 1971, and began writing for television, first for *The Night Stalker*, and later for *The Rockford Files*. (Defendants' Rule 56 Statement of Uncontroverted Material Facts, referred to herein as "Defs. 56.1 Stmt."[2] at ¶¶ 1-2, 7). During his years in Los Angeles, Chase also produced, directed, and created television series;

---

[2] Plaintiff stipulated to Defendants' Rule 56 Statement of Uncontroverted Material Facts, unless specifically disputed in his Statement of Disputed Material Facts.

his credits include *Off the Minnesota Strip*, *Alfred Hitchcock Presents*, *Almost Grown*, *I'll Fly Away*, and *Northern Exposure*.  (*Id.* at ¶ 7).  A number of projects that Chase has worked on involved organized criminal activity and were set in New Jersey.  (*Id.* at ¶¶ 9-11).  Chase had also developed an idea for a script about "a mob boss in therapy," the concept that would become *The Sopranos*.  (*Id.* at ¶¶ 12-13).

In the spring of 1995, while producing and directing a *Rockford Files* "movie-of-the-week" that he had scripted, Chase met Joseph Urbanczyk ("Urbanczyk"), who was working on the project as a camera operator and temporary director of photography.  (Defs. 56.1 Stmt. at ¶ 18).  During their time together, Chase told Urbanczyk that he was "on the lookout" for other writers who could develop feature film screenplays that he might later rewrite and direct.  (*Id.* at ¶ 19).  In addition, Urbanczyk overheard Chase say that the *Rockford Files* creators had yet to assign additional writers for their "movie-of-the-week" deal.  (*Id.*)  Urbanczyk, a longtime friend of the Plaintiff, knew that Plaintiff was interested in a career writing, directing and producing in film and television, and "urged him, on speculation, to try his hand at writing a Rockford script."  (*Id.* at ¶¶ 16, 20).  Plaintiff did so, and Urbanczyk passed his script on to Chase.  (*Id.* at ¶ 22).  Chase read the script, considered it "interesting," and asked Urbanczyk whether Plaintiff had any plans to be in Los Angeles.  (*Id.* at ¶ 23).  After learning of Chase's interest, Plaintiff traveled to Los Angeles, and the three met for lunch at The Ivy, in Santa Monica, California, on June 20, 1995.  (*Id.* at ¶ 24).

At this lunch meeting, Chase explained to Plaintiff that the remaining slots in the *Rockford Files* schedule had been filled, but commented on the script.  (Defs. 56.1 Stmt. at ¶ 26). Plaintiff then told Chase stories involving crime in New Jersey, including stories about Plaintiff's

4

experiences and trials as a prosecutor. (*Id.*) It is undisputed that the stories Plaintiff told were true, based in fact, and not the product of Plaintiff's imagination. (*Id.*) In addition to these stories, Plaintiff pitched another idea: to shoot "movies or television shows about crime in New Jersey and North Jersey mobs." (*Id.* at ¶ 28). Although Plaintiff claims to have mentioned the DeCalvacante Family, the North Jersey Mafia, the City of Elizabeth and the Pulaski Skyway as locations, *see* Answer to Defs. Interrog. 10, it is undisputed that these concepts came with no "detail or drama." (Defs. 56.1 Stmt. at ¶ 28). There was no discussion of payment at The Ivy, and the parties do not dispute that they did not enter into an agreement that day. (*Id.* at ¶ 30). At the time of the lunch at The Ivy, Plaintiff was unaware of Chase's previous work involving mob activity, set in New Jersey. (*Id.* at ¶ 29).

      According to Plaintiff, the oral agreement that is the subject of this lawsuit was made on three separate occasions: the first was by telephone during one of their first two or three conversations during the summer of 1995; the second was also by telephone and took place immediately prior to Chase's October 1995 visit; and the third was in person and entered into by the parties upon Chase's arrival in New Jersey in October of 1995. (Defs. 56.1 Stmt. at ¶ 54). On each of these three occasions, Plaintiff claims that the parties had the same exact conversation. (*Id.* at ¶ 55). Chase offered to pay Plaintiff in the form of a simple transaction: "you help me; I pay you." (*Id.* (quoting Plaintiff Tr. at 129)). Each time, Plaintiff rejected Chase's offer, because Chase would be unable to pay Plaintiff "for the true value of the services [Plaintiff] was rendering." (*Id.* at ¶¶ 55-56 (quoting Plaintiff Tr. at 129)). Each time he rejected Chase's offer, Plaintiff proposed the same counteroffer: "that I would perform the services while assuming the risk that if the show failed [Chase] would owe me nothing. If, however, the show

5

succeeded he would remunerate me in a manner commensurate to the true value of my services." (*Id.* at ¶ 57 (quoting Plaintiff Tr. at 137 and Answer to Defs. Interrog. 5)). Plaintiff has subsequently confirmed that this was the *exact* language that he used to make his counteroffer. (Defs. 56.1 Stmt. at ¶ 58; Plaintiff Tr. at 137:2-13; 157:14-22). However, he also testified that the agreement was made in the following manner: "I said 'What we'll do is I'll take the risk. It's a long shot this thing ever goes anywhere. I'll take the risk and if it ever does, then you take care of me in an appropriate manner at that time' and he said 'Fine' and that's what we did."[3] (Defs. 56.1 Stmt. at ¶ 58; Plaintiff Tr. at 133:7-12). The alleged agreement was always and only oral (Defs. 56.1 Stmt. at ¶ 53), and contained no fixed term of duration. (*Id.* at ¶ 75).

The record fails to show any other discussion between Plaintiff and Chase regarding the terms of the contract. First, there is no dispute that the meaning of "success of the show" was not discussed by Plaintiff and Chase. (Defs. 56.1 Stmt. at ¶ 62). According to the Plaintiff, the contingency depended on the success of the show, but the success contingency would be triggered when Chase himself profited. (*Id.* at ¶¶ 62-63; Pl. 56.1 Stmt. at ¶ 43). However, Plaintiff never told Chase that success would be defined this way or linked to his profits, if any. (Defs. 56.1 Stmt. at ¶ 63). In addition, Plaintiff has conceded that he never discussed with Chase that the agreement and his right to payment would continue as long as the show is a success. (*Id.* at ¶ 75).

---

[3]In his Statement of Disputed Material Facts, Plaintiff explained that the difference between the contract as articulated in the interrogatory answers and the deposition testimony was due to the nature of the Defendants's interrogatory. "Baer['s] answer was never intended to reflect the precise words spoken by the parties." (Pl. 56.1 Stmt. at ¶41.) Although Plaintiff testified at his deposition that this was the *exact* language that he used to make his counteroffer, Plaintiff Tr. at 157:14-22, the Court finds this to be a distinction without a difference, and it is immaterial.

6

Likewise, no price term or amount of compensation was specified in the agreement, no formula for compensation was ever discussed by the Plaintiff and Chase, and there was no discussion of whether payment would be continuing or a one-time fee. (Defs. 56.1 Stmt. at ¶ 68). Plaintiff and Chase never discussed the percentage of profits to which Plaintiff would be entitled, who would make that determination, how that determination would be made, how Chase's profits or the profits of the show were to be defined, or whether Chase even expected to receive any portion of the show's profits. (*Id.* at ¶ 70). Plaintiff admitted that his share of Chase's profits, his compensation, "would be something that David Chase and I would have worked out at the time had he honored his agreement." (*Id.* at ¶ 69 (quoting Plaintiff Tr. at 151:17-19)). With respect to the "true value" of Plaintiff's services, Plaintiff did not propose a mechanism for placing value on his services, or for determining what factors would be considered in making such an evaluation. (Defs. 56.1 Stmt. at ¶ 71). In addition, Plaintiff and Chase did not discuss when Plaintiff's services would be valued, who would decide the true value, how it would be measured, or the elements of any such valuation. (*Id.* at ¶ 72).

In October 1995, Chase visited New Jersey for three days.[4] (Defs. 56.1 Stmt. at ¶¶ 37-38; Pl. 56.1 Stmt. at ¶ 29). While in New Jersey, Plaintiff introduced Chase to Detective Thomas Koczur ("Koczur"), Detective Robert A. Jones ("Jones") and Antonio Spirito ("Spirito"), who provided Chase with information, material, and personal stories about their experiences with organized crime. (Defs. 56.1 Stmt. at ¶¶ 40, 42, 46). In particular, Koczur served as a "tour guide," who, along with Plaintiff, drove Chase to various locations in northern New Jersey. (*Id.*

---

[4]Plaintiff contends that it was his idea for Chase to come to New Jersey. (Pl. 56.1 Stmt. at ¶29.) To the extent that there is dispute over this fact, the Court finds it immaterial.

at ¶ 41).  At a lunch arranged by Koczur, Chase met with Spirito, who told true and sometimes personal stories involving loan sharking, a power struggle with two uncles involving a family business, and two individuals, Big Pussy and Little Pussy Russo.  (*Id.* at ¶¶ 42, 44, 82-83).  Chase also met with Jones, a detective with the Union County Prosecutor's office, who had experience investigating organized crime.  (*Id.* at ¶ 46).  Jones provided Chase with information, including facts about Morris Levy and the infiltration of MCA by organized crime, and access to wiretap tapes that had been entered into evidence at earlier criminal trials.  (*Id.* at ¶¶ 46-50).  Plaintiff does not dispute that virtually all of the ideas and locations that he "contributed" exist in the public record.  (*Id.* at ¶ 80).

### B. The Resolution of Plaintiff's Complaint

Based on these facts this Court granted summary judgment to Defendants and dismissed Plaintiff's Complaint in its entirety on February 20, 2004.  Count Three of the Complaint raised a quasi-contract claim, which Defendants argued was barred by the six-year statute of limitations because Plaintiff admitted in his depositions that all of his services were rendered by the end of October 1995.  In opposition Plaintiff submitted an affidavit, which for the first time pointed out a letter from February 10, 1997, as an indication that he had rendered services more recently.  Under the sham affidavit doctrine this Court disregarded the affidavit and letter and found that Plaintiff's quasi-contract claim was barred by the statute of limitations.  On Plaintiff's appeal, the Third Circuit affirmed on eight of the nine counts and reversed the dismissal of the quasi-contract claim.

**C. Scope of Remand**

In reversing and remanding the quasi-contract claim the Third Circuit explained:

> Plaintiff's ability to point to evidence in the record that corroborates his later affidavit alleviates the concern that he merely filed an erroneous certification out of desperation to avoid summary judgment. Moreover, Chase does not deny receiving the letter and his personal assistant told Baer that Chase, in fact, had received the letter. And finally, Chase himself has provided the letter in discovery. Given this evidence which corroborates the certification, the concern that Baer's claim that he performed services as late as February 10, 1997, is either desperate or erroneous is eliminated, and therefore the court should have analyzed the letter and the circumstances surrounding it and Baer's certification when ruling on the summary judgment motion on the statute of limitations issue. [FN5] The district court therefore erred, at least procedurally, in granting Chase's summary judgment motion based on the statute of limitations with respect to Baer's *quantum meruit* claim. We therefore will reverse the summary judgment on this point and will remand the question of *whether Baer presented a timely and otherwise valid quasi-contract claim* to the district court for further consideration. [FN6]

*Baer v. Chase*, 392 F.3d 609, 626 (3d Cir. 2004) (emphasis added). The Court of Appeals found that the circumstances did not support use of the sham affidavit doctrine and remanded for this Court to consider the February 10, 1997 letter when reexamining "Chase's summary judgment motion based on the statute of limitations with respect to Baer's *quantum meruit* claim." *Id.* In doing so, the Court of Appeals instructed that there be a determination whether the quasi-contract claim was "timely and otherwise valid." *Id.* As it would be unnecessary to consider the claim's validity if the Court found it untimely, the Third Circuit's holding must be read to mean that *if* this Court finds the claim timely *then* it must consider whether the claim is valid. Unfortunately, the footnotes to the holding have confused the matter. They are included below so that the Court might shed light on the matter.

> FN5. Chase argues that even if we refuse to disregard the February 10, 1997 letter, "the letter cannot be characterized as a compensable 'service' as a matter of law." Appellees' br. at 42. Chase contends that we should disregard the February letter on

9

> two grounds, the first of which is its timing. Chase did not receive the letter until some 14 months after he mailed the screenplay to Baer, as well as after all the major networks had rejected the draft. Chase argues that even if the letter had value at one time, it had no value to him when he actually received it. Second, Chase argues that the letter had no value to him as it contained only cursory observations and laudatory phrases about his work. Chase premises his argument on the assumption that in analyzing the statute of limitations for *quantum meruit* purposes we should dissect the last service rendered to deem if it provided value to the opposing party.
>
> We will not affirm the summary judgment on this basis. First, Baer's letter describes the aspects of the screenplay that he believes were successful, the parts to which he related personally, and what humor worked, and provided encouragement to continue with the project. App. at 22. We will not write these contributions off, as Chase attempts to do, as "empty flattery."
>
> Additionally, we will not dissect each interaction between litigants to quantify the precise value of each correspondence or service rendered. The exchange of ideas and services should not be viewed as incremental, segregable interactions that we can assess individually for purposes of the statute of limitations. A separate issue would arise if a litigant sent a correspondence or rendered a "sham service" in an attempt to avoid the statute. That situation, however, does not describe the circumstances before us. We will not engage in Chase's request to judge whether the February letter, taken in isolation, was a "compensable service." We are satisfied that Baer sent the letter and Chase received it, and thus at least at this time it will serve as the "last service rendered" for purposes of the statute of limitations calculus.

*Id.*

The Court of Appeals, in Note 5, declines to address the merits of Chase's substantive defenses raised in the alternative to the quasi-contract claim. However, in doing so the Court appears to discuss and dismiss those very arguments. Moreover, when the Court of Appeals writes that "at least at this time [the letter] will serve as the 'last service rendered' for purposes of the statute of limitations calculus," it appears to conclude that this Court *need not* determine whether the quasi-contract claim was timely. In light of Note 6, however, it is apparent that the Court of Appeals made no such conclusion.

FN6. We do not consider whether Baer was entitled to summary judgment with

> respect to the timeliness of his quasi-contract claim. In this regard we point out that Baer did not move for summary judgment in the district court. While it is not unusual for us when reversing a summary judgment for one party to direct that the district court grant summary judgment to the other party, ordinarily, at least, we do this in circumstances in which the parties made cross-motions for summary judgment in the district court. *See, e.g., Nazay v. Miller*, 949 F.2d 1323, 1327-28 (3d Cir.1991); *First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 281-82 (3d Cir.1987). *Accordingly, we go no further with respect to the statute of limitations issue than to hold that the district court should not have disregarded Baer's certification and it should have considered the February 10, 1997 letter. Therefore our analysis in supra note 5, will not preclude the district court on a fuller examination of the facts from coming to a conclusion contrary to ours as we write on the point merely for the limited purpose of addressing Chase's argument that we should affirm the summary judgment on a different basis than that of the district court.*

*Id.* (emphasis added). The Court of Appeals clarifies that it did not intend to rule on Chase's alternative arguments because they were not the subject of this Court's prior opinion. Moreover, the Court of Appeals acknowledges that this Court is free to accept Chase's alternative arguments upon fuller examination "with respect to the statute of limitations issue." *Id.* Such a reading is further supported by the Third Circuit's conclusion, which reads in part:

> Inasmuch as the district court erroneously disregarded Baer's certification, which, if considered, *might* have precluded the grant of summary judgment on the *quantum meruit* claim on a statute of limitations basis, we will reverse the order of the district court entered February 20, 2004, and remand the case for further proceedings in the district court solely on that claim.

*Id.* at 630 (emphasis added). The Court of Appeals again recognizes that even accepting Plaintiff's certification and February 1997 letter, summary judgment might remain appropriate "on a statute of limitations basis." *Id.*

Although the Third Circuit appears to conclude that the claim is timely in Note 5, the text of the opinion, as well as the clarification in Note 6 and the conclusion, specifically charges this Court with reexamining the *timeliness* of the claim. As a result, this Court, accepting the

11

February 10, 1997 letter, will consider whether the claim is timely and if so, whether it is also valid.  *Baer v. Chase*, 392 F.3d at 626.[5]

## II. Summary Judgment Standard

A court shall grant summary judgment under FRCP 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The substantive law identifies which facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial.  *Id.* at 324.  In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*

---

[5]Plaintiff relies on Note 5 to support his argument that "the issue of timeliness should be removed from this case."  (Plaintiff's Brief on Motion for Partial Summary Judgment ("Plaintiff Motion") at 4).  He contends that in Note 5 "the Circuit Court unambiguously concluded that the substance of the letter constituted a service by Plaintiff to Defendant." (*Id.* at 3).  Plaintiff's interpretation, however, is contrary to the Court's holding.  The text of the opinion expressly requires this Court to determine "whether Baer presented a *timely* and otherwise valid quasi-contract claim," *Baer v. Chase*, 392 F.3d at 626 (emphasis added), which Note 6 confirms.  *Id.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, a genuine issue for trial does not exist unless the non-moving party proffers evidence sufficient to support a jury verdict in its favor.  *Anderson*, 477 U.S. at 249.

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  *Pollock v. American Tel. & Tel Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.  Discussion**

    **A.  Quasi-Contract Relief**

Insofar as the case involves state law, New Jersey law is applicable.  The substantive right to quasi-contractual relief "stems [f]rom the rendition of services."  *Miller v. Bd. of Chosen Freeholders of Hudson County*, 91 A.2d 729, 735 (N.J. 1952).  "Courts generally allow recovery in *quasi*-contract when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust."  *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992).  "*Quasi*-contractual liability 'rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'"  *Id.* (citation omitted).  "Applying that principle, courts have allowed *quasi*-contractual recovery for services rendered when a party confers a benefit with a reasonable expectation of payment."  *Id.* (citations omitted).

13

"That type of *quasi*-contractual recovery is known as *quantum meruit* ('as much as he deserves'), and entitles the performing party to recoup the reasonable value of services rendered." *Id.* (citations omitted). Quasi-contract claims are "controlled by the [six-year] statute of limitations rather than by the doctrine of laches. The statute of limitations applies to legal actions while laches applies to equitable actions. *Quasi*-contract or *quantum meruit*, . . . is actually a legal remedy, albeit one based on equitable principles." *Kopin v. Orange Prods., Inc.*, 688 A.2d 130, 140 (N.J. Super. Ct. App. Div. 1997); *see also* N.J. Stat. Ann. 2A:14-1 (West 2000).

### B.  The Circumstances Surrounding the February 10, 1997 Letter

Plaintiff sent a letter, dated February 10, 1997, to Chase, which Plaintiff described as a "follow[] up on the telephone discussions [he and Chase] had regarding the pilot script and the whole project." (Plaintiff Dec. at ¶ 12). That letter, postmarked February 14, 1997, and received by Chase no earlier than February 17, 1997, was written in response to a pilot script of *The Sopranos* that Chase sent to Plaintiff in December 1995, fourteen months prior. (Chase Cert. To Renewed Motion ("Chase Cert.") at ¶¶ 1-12); *see also* February 10, 1997 letter, attached as Exhibit A to Chase Cert. ("Letter"). Plaintiff acknowledges the gap in time when he apologizes "for the long delay in sending out my comments on 'The Soparanos' [sic]." *See* Letter. Of the fourteen paragraphs in the letter, seven can be considered relevant to Plaintiff's commentary on Chase's script. *Id.* Plaintiff introduces the relevant paragraphs by describing what has happened to him in the intervening fourteen months and concludes with six paragraphs that discuss 1) a script that he was planning to send in hopes that Chase would critique it, 2) an upcoming trip to a tennis tournament to watch Pete Sampras, 3) an extension of a mutual acquaintance's salutations, and 4) a hope that Chase was doing well and might have time to meet for a meal if Plaintiff ever

14

made it to Los Angeles.  *Id.*

Plaintiff begins his discussion of Chase's script by crediting Chase with "transform[ing] an innovative idea into a marvelous screenplay."  *Id.*  He admits he did not initially like Chase's narrative device, but then realized the potential Chase created with it.  *Id.*  Plaintiff next describes why he considers "Tommy Soprano such an interesting character" and comments on the effectiveness of "Tommy Soprano's" conversations with "Melfi" which is "all done with a wonderful sense of random revelations that actually bind together as a central defining question of the script and of our time."  *Id.*  Plaintiff then compliments Chase on the "gems of humor and irony" and the "subtlety" of the mother/uncle alliance, an idea that concerned Plaintiff before he praised Chase for "pull[ing] it off just right . . . ."  *Id.*  The commentary on the script concludes: "Having said all this, I hope the project is still alive.  If not, then perhaps you will resurrect it another time.  I hope so.  There are riches yet to come from the couch of Dr. Melfi."  *Id.*

When Chase sent Plaintiff the script in December 1995, he also sent it to Fox Broadcasting ("Fox") and four or five other people, all of whom promptly responded with comments.  (Chase Cert. at ¶¶ 1-2).  Fox passed on the script in January 1996, as did the other major broadcast networks to which Chase submitted the script.  (*Id.* at ¶ 3).  When the cable station, HBO, expressed interest in early February 1997, Chase began an extensive revision of the script to take advantage of the artistic freedom that cable television could accommodate.  (*Id.* at ¶¶ 4-5).  On or about February 10, 1997, Chase contacted Dan Castleman, whom Chase knew to be intimately involved in investigations of the Mafia for the Manhattan District Attorney's Office, for information to bolster the script for HBO.  (*Id.* at ¶¶ 6-8).  Chase pitched *The Sopranos* to HBO in late February/early March 1997, while reworking the pilot script.  The first

draft of the script for HBO was completed March 4 and later amended on March 13 and 14 before the final draft of March 17 was submitted and subsequently accepted. (*Id.* at ¶ 12).

Chase received Plaintiff's letter and unrelated script no earlier than February 17, 1997. (*Id.* at ¶ 9). Chase read Plaintiff's script and contacted Plaintiff by phone to offer his comments before returning the letter and script on or about May 16, 1997. (*Id.* at ¶¶ 9-11). Plaintiff acknowledges that the February 10, 1997 letter was the last time he offered Chase any comments about the project. (Plaintiff Dec. at ¶ 12).

**C. Rendition of Services**

Plaintiff's quasi-contract claim accrued, if at all, when his final services were rendered. *Miller*, 91 A.2d at 735. As the Third Circuit has charged this Court with considering the timeliness of Plaintiff's quasi-contract claim, the basic question to be answered is whether the February 10, 1997 letter amounts to a rendition of services. The circumstances also demonstrate that this is the proper inquiry. Plaintiff previously declared that all of his services were rendered by the end of October 1995. Although Plaintiff has since alleged to have had approximately four telephone conversations with Chase during the fourteen months between receipt of the script and when he wrote the letter, *see* Plaintiff Dec. at ¶ 11, he does not now argue that any phone calls, or their combination with the letter, constitute the performance of services. Rather, Plaintiff argues that the February 10, 1997 letter alone, is tantamount to a performance of service sufficient to satisfy the statute of limitations. As a result, Plaintiff's services were complete as of October 1995 unless the February 1997 letter conferred a benefit on Chase.

At the time Chase received Plaintiff's letter, the script that Plaintiff "critiqued" had been rejected by all the major broadcasting companies and returned with comments by the other

16

people to whom Chase had sent the script. Also, based on HBO's interest Chase had already begun a major rewrite of the script and consulted with Dan Castleman for more intimate details about organized crime. In light of such events, it is doubtful that Plaintiff's comments about a script that was, for all intents and purposes, discarded, could really be of any value to Chase. For arguments' sake, however, the Court will analyze Plaintiff's letter as though Chase had patiently waited fourteen months for Plaintiff's comments before changing the script and submitting it to the networks or HBO.

Plaintiff writes about the aspects of the script that he enjoyed, crediting Chase with "transform[ing] an innovative idea into a marvelous screenplay." Even assuming that the "innovative idea" was Plaintiff's, a claim that Plaintiff does not make and that this Court and the Third Circuit specifically rejected,[6] Plaintiff praises Chase alone for making the idea screenworthy. Plaintiff then compliments Chase for using a narrative device that Plaintiff "had some initial reservations about . . . ." Plaintiff applauds the creation of an interesting character in "Tommy Soprano" and a dialogue with "Melfi" that Chase has "done with a wonderful sense of random revelations that actually bind together as a central defining question of the script and of our time." Again, Plaintiff gives all the credit to Chase. Plaintiff then recognizes Chase for his "gems of humor and irony" and though Plaintiff did not originally like the mother/uncle alliance he praises Chase for "pull[ing] it off just right" with a "subtlety" that made it work. At best, Plaintiff's comments convinced Chase, who Plaintiff credits with developing all the ideas, to keep the complimented passages in the script. Plaintiff never suggests that Chase should change

---

[6]*See Baer v. Chase*, Civ. Act. No. 02-2334, 2004 WL 350050, *12-14 (D.N.J. Feb 20, 2004), *aff'd Baer v. Chase*, 392 F.3d 609, 627-30.

or cut aspects of the script. Based on Plaintiff's comments the resulting script would have been the one that every major broadcasting company rejected. Thus, even if Chase waited the fourteen months and relied solely on Plaintiff's comments, he would have been disadvantaged rather than unjustly enriched. The Court finds that Plaintiff did not confer a benefit to Chase with the February 10, 1997 letter and therefore failed to perform a service. As a result, the February 10, 1997 letter is excluded from the statute of limitations consideration. The Plaintiff's services are deemed rendered as of October 1995 and the quasi-contract claim filed in May 2002 is barred by the statute of limitations. As the Court concludes that the quasi-contract claim is untimely, an examination of the claim's validity is unnecessary.

## IV. Conclusion

For the reasons expressed above, Plaintiff's motion for partial summary judgment is denied and Defendants' motion for summary judgment is granted. Accordingly, this case is CLOSED.

s/ Joel A. Pisano<br>
JOEL A. PISANO, U.S.D.J.

Dated: April 29, 2005