**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

RECEIVED

NOV 1 5 2007

AT 8 :0_____M
W:~ ''IAM T. WALSH
: PK

|  |  |  |
|---|---|---|
| ROBERT V. BAER, | : | Civil Action No.   02-CV-2334 (JAP) |
|  | : | : |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| DAVID CHASE, DC ENTERPRISES | : | **FINAL PRETRIAL ORDER** |
| INC., a Delaware corporation, and | : |  |
| JOHN DOES A-Z, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

This matter having come before the Court for a pretrial conference pursuant to *Fed. R. Civ.*

*P. 16*; and Robert V. Baer, Esq. and Harley D. Breite, Esq. having appeared for plaintiff; and

Peter L. Skolnik, Esq. having appeared for defendant; the following Final Pretrial Order is

hereby entered:

**1.     JURISDICTION (set forth specifically).**

The Court has jurisdiction pursuant to 28 U.S.C 1332, because Plaintiff resides in New
Jersey, Defendant David Chase resides in New York, Defendant DC Enterprises, Inc. is a
Delaware Corporation; and the amount in controversy exceeds $75,000.

**2.     PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated
motions, whether dispositive or addressed to discovery or to the calendar. Also, set
forth the nature of the motion and the return date. If the Court indicated that it
would rule on any matter at pretrial, summarize that matter and each party's
position).**

Defendants have filed a motion *in limine* seeking to bar certain testimony, to bar certain
witnesses from testifying, and to delineate the roles of the pro se Plaintiff during trial.
Pursuant to the Court's July 20, 2007 Notice of Jury Trial, Defendants' motion is returnable
on November 19, 2007.

1

3. STIPULATION OF FACTS (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

    1.    Plaintiff, Robert Baer, is an attorney in the State of New Jersey.

    2.    Plaintiff has worked as an Assistant Prosecutor in both Hudson and Union Counties in New Jersey. Plaintiff also served as a Municipal Judge in Passaic County from January, 1999 to January, 2005.

    3.    Defendant, David Chase, is the writer/director/producer/creator of the television show, *The Sopranos*.

    4.    Prior to his work on *The Sopranos*, Defendant had an extensive career in television as a writer/producer and/or executive producer for hit shows such as *The Rockford Files* and *Northern Exposure*.

    5.    Defendant DC Enterprises, Inc., is a loan-out company, in which Defendant, Chase, is a principal.

    6.    In Spring of 1995, Plaintiff's friend, Joseph Urbanczyk, a cameraman and cinematographer in Hollywood, worked on an episode of *The Rockford Files*, written and directed by Defendant.

    7.    At the time, Plaintiff had recently left the Union County Prosecutor's Office in Elizabeth, New Jersey, where he had worked for the previous six years.

8.    Urbanczyk mentioned to Defendant that he had a friend, a former Assistant Prosecutor in New Jersey, who had many interesting ideas that might be turned into film or television projects.

9.    Urbanczyk told Plaintiff that as a result of the relationship he had developed with Defendant, he believed that if Plaintiff were to write a *Rockford Files* script, Defendant would be willing to read it.

10.    Pursuant to Urbanczyk's suggestion, Plaintiff wrote a *Rockford Files* screenplay.

11.    Plaintiff sent the script to Urbanczyk, who gave it to Defendant.

    12.    Shortly after receiving the script, in late May or early June of 1995, Defendant contacted Urbanczyk, told him that he had read Plaintiff's script.

2

13.   After speaking to Plaintiff, Urbanczyk contacted Defendant, told him Plaintiff was coming to Los Angeles and arrangements were made for all three men to meet.

14.   Defendant chose *The Ivy*, a restaurant in Santa Monica.

15.   When Plaintiff flew to Los Angeles, he and Urbanczyk met with Defendant for lunch at *The Ivy* on June 20, 1995.

16.   Within a few weeks after the meeting at *The Ivy*, Defendant contacted Plaintiff at Plaintiff's home.

17.   Defendant flew into New York City on the evening of October 24, 1995.  Upon his arrival, Defendant took a room at the St. Regis hotel in Manhattan.  The two men began working early the following morning.

18.   On October 28, 1995, Defendant flew back to Los Angeles to write the screenplay.  He completed the first draft, which is dated December 6, 1995, within five weeks.

19.   A copy of the second draft of *The Sopranos* pilot, dated December 20, 1995, was sent to Plaintiff by Defendant.

20. B   aer has not paid, and has no arrangement to pay, Koczur, Jones, Spirito, Urbanczyk or anyone else for their roles in Baer's dealings with Chase.  All of them agreed to participate as a favor, and without compensation.

21.   On January 10, 1999, *The Sopranos* premiered on HBO.

4.   **PLAINTIFF'S CONTESTED FACTS (State separately for each plaintiff.  Proofs shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof).**

A.   **Plaintiff intends to prove the following contested facts with regard to liability.**

1.   Plaintiff Robert V. Baer, ~~residing at 4 Laurel Drive, in the Township of Wayne, County of Passaic, State of New Jersey~~, has been a licensed member of the New Jersey bar in good standing since 1986.

2.   Prior to opening his private practice in 1996, Plaintiff was a successful Assistant Prosecutor in both Hudson and Union Counties, trying over 60 cases to verdict, and participating in the investigation of numerous homicide cases.

3

3.     Throughout his career, Plaintiff has developed an extraordinary level of personal expertise, along with a commensurate level of contacts with experts pertaining to crime, criminal syndicates, the law, law enforcement, and organized crime in New Jersey.

4.     It was Plaintiff's services that enabled Defendant Chase to turn *The Sopranos* from a pipe-dream to reality.

5.     Defendant David Chase is the writer/director/producer/creator of the television show, *The Sopranos*.  Chase has been described as "the master cylinder", "the show's creative capo", and "the mastermind behind *The Sopranos*".

6.     Prior to *The Sopranos*, Chase enjoyed a long career in television as writer/producer and/or executive producer for hit shows such as *The Rockford Files* and *Northern Exposure*.

7.     Defendant Chase is a principal in Defendant DC Enterprises, Inc., which upon information and belief, is Defendant Chase's production company.

8.     Chase has had offices at 4024 Radford Avenue, Administration 280, Studio City, California 91604, and at 75 Rockefeller Plaza, New York, New York 10019.

9.     Although Defendant Chase resided in California at the time of the creation, development and filming of the pilot of *The Sopranos*, most of the pilot, as well as subsequent episodes, were shot on locations in the State of New Jersey, and most of the meetings between plaintiff and defendant pertinent to this matter, took place within the State of New Jersey.

10.     Defendant DC Enterprises, Inc., a Delaware corporation in business as Defendant Chase's production company, is Defendant Chase's corporate alter-ego.

11.     DC Enterprises, Inc. also has had offices at 4024 Radford Avenue, Administration 280, Studio City, California 91604, and at 75 Rockefeller Plaza, New York, New York 10019.

12.     DC Enterprises, Inc. is a division of Time Warner Entertainment Company, L.P., and is at least a part owner of *The Sopranos* and all related characters.

4

13.    In the Spring of 1995, Plaintiff's friend, Joseph Urbanczyk, a cinematographer in Hollywood, worked on an episode of *The Rockford Files* directed by David Chase.

14.    On the set, Urbanczyk became very friendly with Chase.

15.    Urbanczyk told Plaintiff, in telephone conversations, that he and Chase had enjoyed a lot of good laughs while working together.

16.    At the time, Plaintiff had recently left the Union County Prosecutor's Office in Elizabeth, New Jersey, where he had worked for the previous six years.

17.    Plaintiff also worked for two years prior to that in the Hudson County Prosecutor's Office in Jersey City, New Jersey.

18.    Urbanczyk, on numerous occasions, told Plaintiff that Chase had told him that he was looking for new material. Chase also complained to Urbanczyk that he felt his career had stalled, stating that he was trapped in what he described to Urbanczyk as "development hell."

19.    Urbanczyk mentioned to Chase that he had a friend, a former Assistant Prosecutor in New Jersey, who had many interesting ideas that might be turned into film or television projects.

20.    After Chase mentioned to him that not all the pending Rockford Files scripts had been written yet, and after hearing Chase express interest in exploring new ideas, Urbanczyk suggested to Plaintiff that Plaintiff write a script for the show.

21.    Urbanczyk told Plaintiff that as a result of the relationship he had developed with David Chase, he believed that Chase would be willing to read it.

22.    Based on Plaintiff and Urbanczyk's history, it was entirely natural for Urbanczyk to suggest to Plaintiff that he write such a screenplay.

23.    Urbanczyk knew that Plaintiff always had a strong interest in film.

24.    Both of Plaintiff's parents were involved in local theater their entire lives.

25.    Plaintiff's oldest brother is a Professor of Literature and Film at the University of Evansville, holding a degree in Film from The University of Southern California.

5

26. Urbanczyk and Plaintiff had been friends since kindergarten. As they got older they shared a mutual interest in films, making endless trips to New York City theaters to watch foreign films and movies that were difficult to find.

27. This interest led Urbanczyk to his career in cinematography.

28. Urbanczyk and Plaintiff have talked for many years about the possibility of one day working together on film projects.

29. Pursuant to Urbanczyk's suggestion, Plaintiff went to work writing a screenplay, which he completed by May 17, 1995.

30. The script was based on Chinese organized crime and loosely derived from a personal experience in which Plaintiff had participated in a federal investigation of Chinese gangsters known as "Snakeheads."

31. Plaintiff sent the script to Urbanczyk, who gave it to Chase.

32. Shortly after receiving it, in late May or early June of 1995, Chase contacted Urbanczyk, told him that he had read Plaintiff's script and spoke enthusiastically about it.

33. In the same conversation, Chase told Urbanczyk that he would like to meet Plaintiff. Urbanczyk called Plaintiff, and suggested that Plaintiff come to Los Angeles.

34. Urbanczyk again told Plaintiff that Chase was looking for material and that Plaintiff should be prepared to pitch various ideas to him in addition to discussing his *Rockford Files* script.

35. Plaintiff decided to fly out to Los Angeles to meet Chase.

36. Prior to leaving, Plaintiff made mental notes of various ideas that, in Plaintiff's view, would make good films or television shows, and which Plaintiff would pitch to Chase.

37. Urbanczyk contacted Chase, told him Plaintiff was coming to Los Angeles, and arrangements were made for all three men to meet.

38. Chase chose *The Ivy*, a restaurant in Santa Monica, world famous as a place where television deals are struck.

39. When Plaintiff flew to Los Angeles to meet with Chase, Plaintiff knew him to be an established and successful producer in Hollywood.

6

40. Urbanczyk, Plaintiff, and Chase met for three hours at *The Ivy* on June 25, 1995.

41. During lunch, Plaintiff pitched a number of ideas to Chase.

42. At some point, very early in the conversation, Chase surprised Plaintiff and Urbanczyk by saying to them: "My days of doing crime shows are over."

43. Nevertheless, he continued listening to Plaintiff's ideas.

44. One idea Plaintiff suggested to Chase was that he consider developing a film or television show about the North Jersey mafia.

45. Plaintiff explained to Chase that there existed an indigenous mafia family in the Elizabeth-Newark area that, to Plaintiff's knowledge, had never been the subject of a film or television show.

46. Plaintiff told Chase that the mafia group was known as the Decavalcante family and Plaintiff explained what he understood, based on his knowledge working in the Prosecutor's Office, to be their involvement in narcotics trafficking in North Jersey.

47. Plaintiff vividly recalls relating to Chase a lengthy story about a powerful drug trafficking gang in the Elizabeth area which was considered by the FBI as one of the most ruthless gangs in the nation.

48. Its leader, Bilal Pretlow, was among the first individuals ever to be prosecuted under a then new federal statute providing the death penalty for "drug kingpins."

49. Plaintiff told Chase how Pretlow later committed suicide in the Union County Jail.

50. Plaintiff explained to Chase the links that were believed to have existed between the "Pretlow gang" -- as well as its rivals -- and the Decavalcante mafia family.

51. Chase, however, was extremely reticent about developing anything that had to do with the mafia.

52. He told Plaintiff that he believed that the mafia theme had been pretty much exhausted. Nevertheless, as the meeting progressed, Chase became particularly interested in Plaintiff's discussion of the various criminal syndicates.

7

53.   Plaintiff countered Defendant's reticence by pointing to the enduring success of *The Godfather* movies.

54.   In addition, Plaintiff emphasized his belief that Bruce Springsteen had transformed New Jersey's image around the world.

55.   Plaintiff clearly recalls saying to Chase that there were people all over the world who think of the New Jersey Turnpike as a romantic place simply because of Springsteen's music.

56.   Plaintiff also mentioned Springsteen's song, *"Atlantic City,"* and explained to him what was meant by the song's references to "the Chicken Man," a Mafioso from Philadelphia.

57.   Plaintiff strongly emphasized Plaintiff's belief that, in many ways, Springsteen had set the stage for a show or film set in New Jersey.

58.   Plaintiff's discussion of Springsteen, and the idea of setting a film or show in New Jersey, seemed to arouse Chase's interest.

59.   It was at this point in the conversation that Chase mentioned that he had once passed around an idea about a gangster who had a difficult relationship with his mother, but the idea was never developed.

60.   This was an old idea that Chase made clear he was not working on at the time of the meeting.  At that time, he said he was involved in *Rockford Files* production work and was re-writing, or developing a film called *"Snow Day"*.

61.   Plaintiff also suggested that the show could be shot in Elizabeth, New Jersey, where he had just finished working as an Assistant Prosecutor in the Union County Prosecutor's Office.

62.   Chase told Plaintiff that he had never been inside the city of Elizabeth in his life, and exhibited no familiarity whatsoever with Elizabeth during *The Ivy* meeting

63.   Later Chase told Detective Thomas Koczur of the Elizabeth Police Department that he had only been in Elizabeth when he flew into Newark International Airport -- a part of which (terminal A) is located in Elizabeth, the rest is in Newark.

64.   Throughout Plaintiff's entire conversation with Defendant at *The Ivy* - as well as through all subsequent conversations -- Chase demonstrated no knowledge whatsoever of the North Jersey mafia. He had never heard of the Decavalcante family and exhibited no more than a rudimentary understanding of organized

8

crime, no more than the kind of knowledge possessed by millions of people who have seen the movies, *The Godfather* and *GoodFellas* and read a few newspaper articles on the subject.

65.    Chase's so-called ongoing "fascination" with the mafia, went undetected by Plaintiff, as well as all of the other people, including specialists, Chase met in New Jersey.

66.    From the beginning it was obvious to Plaintiff that Chase's real "fascination" was with representing psychiatric issues on film, particularly his own difficult relationship with his mother - a topic he has addressed freely and openly many times on the public record.

67.    It seemed to Plaintiff that, for Chase, the mafia would only a means of exploring those issues and was incidental to them.

68.    On the other hand, Plaintiff strongly felt that the only way this kind of show would ever succeed would be to tap into the pulse of small-time Jersey mobsters. Plaintiff continued to believe this as he later arranged the sole development trip for the project.

69.    Throughout the meeting, Plaintiff made his presentations to Chase, like anyone making a pitch to a Hollywood producer, with the hope that Chase would like an idea and would want to use it.

70.    Chase was the exclusive recipient of Plaintiff's presentation, which was presented to him in confidence, with only Urbanczyk present, who Chase understood to be a confidant of Plaintiff's.

71.    While Chase and Plaintiff did not enter into an agreement at *The Ivy*, Plaintiff absolutely expected to be compensated in the event Chase were to actually use any of Plaintiff's ideas, suggestions, advice opinions and services.

72.    Plaintiff certainly did not fly across the country, as Chase contends, to provide Chase with Plaintiff's ideas, suggestions, advice, opinions and services for free.

73.    Chase, an experienced producer in the television industry, fully understood this.

74.    At the end of the lunch, Chase paid the bill and took Plaintiff's telephone number.

75.    Within two weeks after the meeting at the Ivy, Chase contacted Plaintiff at Plaintiff's home in New Jersey and expressed his interest in Plaintiff's idea. In their conversation, Chase solicited Plaintiff's assistance in an effort to research

9

and develop a television pilot set in New Jersey, dealing specifically with the mafia of New Jersey.

79. This began a series of phone calls in which Chase asked questions of every type, concerning crime, criminal syndicates, and the law.

80. Plaintiff either answered Chase directly, or if Plaintiff did not immediately have the information, he researched the answer, and then called Defendant back within a short period of time, providing detailed responses.

81. Early in their conversations Chase raised the topic of compensation.  Chase offered to pay Plaintiff for Plaintiff's assistance.  The parties were fully aware that Plaintiff's services were not being rendered gratuitously.

82. Plain    tiff was aware that Chase had been given a small amount only to write the pilot screenplay.

83. In fact, the network, Fox, that paid him to write it, later passed on the script.

84. Chase never told Plaintiff that Brillstien Grey told Chase that they would not pay Plaintiff.

85. Plaintiff told Chase that Plaintiff's assistance would be more valuable than the small amount Chase could then pay.

86. This turned out to be true far beyond anyone's expectations.

87. Plaintiff proposed to Chase that they keep working and that if the show didn't go anywhere (which is common with the overwhelming majority of such projects) Chase would not owe Plaintiff anything, but if the show succeeded, Chase would pay Plaintiff the "true value" of Plaintiff's services.  Chase readily agreed to this each time the topic was discussed.

88. Plaintiff specifically remembers using the words "true value" because it was said in the context of Plaintiff's belief that Chase's payment of a small sum would not reflect the "true value" of Plaintiff's contribution if this show were to succeed.

89. Chase did not contest this in any way whatsoever.  On the contrary, he immediately agreed to Plaintiff's proposal and the two men continued working.

90. A similar conversation occurred at least two more times.  The next time was on the telephone prior to Chase's visit to New Jersey in October of 1995.  The third time was in person, when Plaintiff met Chase in New Jersey, which was on

10

October 25, 1995. Plaintiff and Chase entered into an oral agreement, reiterated on several occasions and fully understood by both parties.

91.  Because Plaintiff and Chase had by that time developed a tremendously effective working relationship, which Plaintiff believed to be characterized by a high level of trust and confidence, Plaintiff accepted Chase's word, and felt there was no need for a written agreement.

92.  During Plaintiff's telephone conversations with Chase, Plaintiff made several suggestions to Chase.

93. In July of 1995, Plaintiff proposed that a character in the show could be based on the life story of Morris Levy, an aging Jewish mobster who had been heavily involved in record industry scams.

94.  In providing that suggestion, Plaintiff recalled that a co-worker in the Union County Prosecutor's Office, then Detective-Sergeant Bobby Jones, had once told Plaintiff a lengthy and fascinating story about his investigation into Levy's involvement in the mafia-related MCA Records case where "cut-out" merchandise was diverted by a mob insider, Sal Pisello, to "dummy" companies set up by Levy.

95.  The case eventually became the subject of a book titled *Stiffed* (which came from a comment Detective Jones made to the author), written by William Knoedelseder and published in 1993.

97.  Although they did not work regularly together, Detective Jones was the supervisor over the detectives in the Trial Unit with whom Plaintiff worked every day during Plaintiff's initial years in Union County.

98.  Plaintiff was also very good friends with another UCPO Detective, Eddie Fitzgerald, who had worked with Jones on the Levy case and later worked with Plaintiff in the Homicide Unit.

99.  Shortly after Chase contacted Plaintiff, he reached out for Detective Jones - first calling Fitzgerald.

100.  Jones retold the MCA story to Plaintiff over the phone.

101.  This conversation immediately confirmed Plaintiff's sense that this would be extraordinary material to include in a show about the New Jersey mafia.

11

102. During Plaintiff's next telephone conversation with Chase, Plaintiff relayed to him the details about Levy, the MCA case, and the involvement of the Decavalcante family and again proposed the idea of a character based on Levy and a story line modeled on the MCA scam.

103. Plaintiff also suggested to Chase that a waste management company would be a good front business for a New Jersey mafia family.

104. Plaintiff was aware, from his years as a prosecutor, that there were a number of waste management companies in Elizabeth that were alleged to be mob-connected.

105. Plaintiff also discussed with Chase the way the mafia conducted its business.

106. Plaintiff was not a specialist in organized crime, but he did have a very substantial amount of knowledge on the subject as well as friends and associates, some of whom were specialists.

107. At the close of one conversation, Chase asked Plaintiff if he had any notes from Plaintiff's conversations with Plaintiff's friends and associates. By that time this included conversations with, at least, Detective Koczur, Detective Fitzgerald, Detective Jones and Detective Joseph Vitelli, the latter being a very close friend of Plaintiff's who also worked with Plaintiff in the Homicide Unit and had assisted the federal authorities in the investigation of mafia-related homicides.

109. Plaintiff explained that all he had written down was some "chicken scratch" that Chase probably could not read. Plaintiff told him that he would type up some notes reflecting the various things discussed, including things Plaintiff had learned from Plaintiff's friends, and send them to Chase.

110. Chase was extremely anxious to receive Plaintiff's typed notes and insisted that Plaintiff send them by Fed Ex overnight delivery and stated that he would pay for the mailing.

111. Plaintiff typed the notes and sent them to Chase by Fed Ex. Later Chase sent Plaintiff a check for $23 to pay for the postage.

112. In the notes, which were sent on July 22, 1995 - less than a month after the lunch at *The Ivy* - Plaintiff mentioned Morris Levy, the MCA case, the Decavalcantes, waste management and a number of other items that Plaintiff had suggested and explained to Chase during their conversations.

12

113.   At some point Chase asked if Plaintiff thought it would be a good idea for Chase to come to New Jersey, so that he could meet with Plaintiff, as well as others having expert knowledge on the subjects pertinent to the project, such as crime, criminal syndicates, the law, law enforcement, and organized crime in New Jersey.

114.   Plaintiff told Chase that he would make a few calls and get back to him.

115.   Plaintiff did that, realized how much the project would benefit from such a trip, called Chase back, suggesting that he come.  They then made plans for Chase to arrive in October of 1995.

116.   In that conversation, Chase again raised the issue of Plaintiff's compensation, which was, once more, addressed in precisely the manner set forth above.

117.   Plaintiff then spent several painstaking weeks arranging various meetings with a number of experts for Chase's scheduled three day trip to New Jersey in October of 1995.

118.   Plaintiff, at Chase's request, organized the trip for purposes of educating Chase, who clearly knew next to nothing about organized crime, and even less about criminal syndicates operating in New Jersey, and, in the process, providing him with the material he needed in order to write the pilot script.

119.   After the final arrangements were made, Chase again raised the issue of Plaintiff's compensation, which was once more addressed precisely in the manner as set forth above.

120.   Chase flew into New York City on the evening of October 24, 1995.  Upon his arrival, he took a room at the Regency hotel in Manhattan and immediately called Plaintiff to make final arrangements. The two men began working at 8 a.m. the following morning.   Chase drove from Manhattan, parked his rented car outside the home of Plaintiff's friend, Bruce Fengya in Clifton, New Jersey, and Plaintiff and Chase then set out to explore the world of organized crime, with Plaintiff and his contacts educating Chase, providing Chase with suggestions and advice and generally discussing the project.

121.   For the next three days, Plaintiff and Chase spent at least 15 hours a day together gathering information, developing ideas, themes and story lines for the project, as visiting various people with different types of relevant expertise and experiences as well as locations that would be useful for incorporation into the pilot.

13

122. Throughout this intensive three-day crash course on crime, criminal syndicates, and specifically, mafia operations in New Jersey, Chase received most of the concepts and information that he needed to write the pilot.

123. Most of this information came directly from Plaintiff, although a good deal of material also arose spontaneously, just as Plaintiff had hoped for and anticipated while arranging the trip.

129. Prior to Chase's visit to New Jersey, Plaintiff asked Detective Koczur if he knew anyone familiar with the North Jersey mob that might be willing to talk to Chase.

130. Koczur suggested an individual named Tony Spirito.

131. Plaintiff was somewhat familiar with the Spirito family, particularly with the fact that there had been some kind of struggle regarding the family restaurant named *Spiritos* located in Elizabeth. Plaintiff had dinner at *Spiritos* many times through the years while working in Elizabeth at the Union County Prosecutor's Office.

132. Plaintiff also recalled that a female Spirito family member – a sister of Tony Spirito -- had entered law enforcement. Plaintiff had met her while working at the Hudson County Prosecutor's Office.

133. Detective Koczur, who grew up in Elizabeth, told Plaintiff that he had known Tony Spirito, also a lifelong Elizabeth resident, his whole life.

134. Tony Spirito's father, Louis Spirito, had been the owner of *Spirito's* restaurant, a place known for entertaining people with connections to organized crime. Upon his death, his son, Tony Spirito, believed he would inherit the family business, including the restaurant.

135. After talking with Detective Koczur, Plaintiff thought it would be a terrific idea for Chase to meet with Tony, for a number of reasons:

1)   An alleged connection between Tony and his family with the Decavalcante crime family;

2)   The fact that Tony had been involved in a bitter struggle with his uncle over the family restaurant after the death of his father was intriguing, as it seemed clear to Plaintiff that this kind of struggle was far more realistic than Chase's idea - derived from his own life experience and first mentioned to Plaintiff at the

14

Ivy Restaurant Meeting - of a struggle for power between the son of a deceased mobster and his mother.

    3)    Tony had lost a pizzeria he owned to a Newark loan shark after gambling, and losing $20,000 on the Hagler-Leonard fight. Plaintiff thought it would be interesting to show the enormous power of a loan shark and suggested this as a possible story line for the pilot;

    4)    Detective Koczur had told Plaintiff that he knew Tony all his life and that Tony was one of the most colorful people he had ever met.

136.   Plaintiff understood "colorful" to mean in the sense having a kind of Mafioso demeanor.

137.   This turned out to be true and Tony's unique personality did, in fact, tremendously enliven the meeting.

138.   At some point prior to Chase's arrival in New Jersey, Plaintiff informed him that he had lined up a guy with alleged mob connections who had a very interesting life-story.

139.   As with all the details of the trip, Chase accepted this without reservation.

140.   When Chase arrived, the timing was extremely fortuitous because Tony Spirito had just been released from the Union County Jail the day before.

141.   Detective Koczur and Plaintiff arranged the meeting with Tony Spirito for Chase's first day in New Jersey, October 25, 1995, at *The Madrid* restaurant in Elizabeth, New Jersey.

142.   The four men met at the Madrid and Tony Spirito told Chase detailed stories about his life.

143.   Tony Spirito explained to Chase that after his father died his uncle sought the help of his mother in a fight to get control of the family business, *Spiritos* restaurant.

144.   Tony Spirito explained to Chase that his uncle prevailed in this bitter family struggle and ultimately succeeded in obtaining ownership of *Spiritos*.

145.   Detective Kozcur and Plaintiff told David Chase that they would not be able to visit *Spiritos* during their time in Elizabeth because such a visit would be perceived as insulting to Tony.

15

146.   By the end of the lunch, Chase had become so intrigued with Tony that he asked if he could drive him home.

147.   Detective Koczur and Plaintiff agreed, and Chase and Tony left together while Koczur and Plaintiff remained at *The Madrid*.

148.   Chase returned after approximately thirty to forty-five minutes.

149.   This was the only time during the three days when Chase and Plaintiff were separated for any substantial period of time.

150.   After the meeting with Tony Spirito at the Madrid, Detective Koczur, at Plaintiff's request, further elaborated on what he understood about the intra-family struggle that followed the death of Tony father.

151.   The principal story line of *The Sopranos* is established in the original pilot script dated December 6, 1995 -- a virtually identical script, containing only a few changes, is dated December 20, 1995, which Chase sent to Plaintiff shortly after writing it. This storyline is incorporated into the Sopranos pilot airing on January 11, 1999.

152.   The story line in the pilot is as follows: After the death of Tony Soprano's father (in the original pilot script sent to Plaintiff by Defendant, Tony Soprano was named "Tommy Soprano"), Tony finds himself fighting against his uncle, who seeks an alignment with Tony's mother, in an effort to secure the family business for himself and to keep it away from Tony.

153.   This tacit alliance between mother and uncle is made strikingly clear in the final scene of the pilot when Tony's mother and his Uncle Junior drive to a birthday party for Tony's son at the Soprano home.

154.   During the ride Uncle Junior spoke in guarded, but unambiguous, language regarding his problems with Tony, telling Tony's mother that the New York mafia leaders were complaining about Tony's leadership in the Soprano family. Uncle Junior goes so far as to suggest to Tony's mother that they might have to kill Tony - a suggestion to which she gives no objection.

155.   After the lunch with Tony Spirito, Plaintiff continued to advise Chase that a struggle with an uncle, as in the Spirito case, would be far more realistic and plausible for a story line in a mafia show than a struggle for control of the family with the main character's mother.

156. From the outset, Chase had always focused on a fight between mother and son. His own so-called "Theme Memo" demonstrates idea unambiguously, as it states as an idea: "Mob/Mother/Son   The son of a deceased mobster finds that his only rival for power is his mother."

157. Chase had asked Plaintiff several times if Plaintiff had ever heard of a mafia mother whom Chase claimed she had read about who was supposedly involved in a power struggle.

158. Plaintiff told him that he was unaware of any such situation.  He also advised Chase that it was highly unlikely that in the mob culture a woman would be vying to become the family boss.

159. Much later, in an interview with Charley Rose, Chase again mentioned his belief that such a mob mother exists.  He told Rose that there was a woman "in Philadelphia who was quite a contender."

160. Chase was actually referring to a Boston grandmother who ran a family burglary ring with her sons.  The woman had no connection with the mafia.

161. Still, Chase was deeply attached to his mother/son power struggle concept.  This was only altered when Plaintiff introduced Chase to Tony Spirito, whose story was used in part, to greatly modify Chase's concept.

162. During the meeting at *The Madrid*, Tony Spirito elaborated for David Chase the story about his loan shark problem.  The story, as told to Chase included the following elements:

   1)   According to Tony, after losing the family restaurant he managed to open a pizzeria.

   2)   Sometime thereafter Tony bet heavily and lost on the prize fight between Marvin Hagler and Sugar Ray Leonard.

   3)   To pay his debt he borrowed $20,000 from a loan shark in Newark.

   4)   Ultimately, he couldn't pay back the money and the loan shark took his pizzeria.

   5)   Tony Spirito told Chase that when he went to pick up the $20,000, he was only given $19,000.

17

6)      When he questioned the loan shark about the amount of money, he was told: "That's the first week's 'vig.'"

163.   Afterwards Detective Koczur and Plaintiff reviewed the whole story in greater detail, explaining to David Chase the meaning of a "vig." They also drove Chase to the very place in Newark, a live poultry market, where Tony Spirito had borrowed the money from the loan shark.

164.   The next day, at Benito's restaurant, Plaintiff asked Detective Jones to talk in some detail about the way in which loan sharks use debts to takeover a business.

165.   Detective Jones reiterated some of the things that Plaintiff had already told Chase and added his own thoughts.

166.   During their time together, Plaintiff suggested that Chase incorporate a similar loan shark business takeover into the pilot.

167.   Chase did so, writing a story into the pilot script in which the character, like Tony Spirito, loses his business, a travel agency, due to a loan shark debt.

168.   Not surprisingly, the character was named "Spiros." - which seemed to Plaintiff, considering the similarity in the story, and the proximity in time between hearing the story and writing it into the pilot -- to be derived from "Spirito."

169.   By the time the show aired in January of 1999, the name changed again, as did the type of business which became an HMO company.

170.   But, the story line of a mob-related loan shark business takeover, which Plaintiff suggested and developed through Spirito and Jones, was used in the opening of the pilot episode on January 10, 1999.

171.   Plaintiff had previously suggested to Chase that a "waste management" company would make a good "front" for the mob. Plaintiff, moreover, was aware that there were such companies operating in Elizabeth.

172.   To further develop this concept, Plaintiff asked Detective Koczur to drive Chase and Plaintiff to the locations of the waste management companies in Elizabeth.

173.   While Koczur, Chase, and Plaintiff were driving through one of Elizabeth's Industrial Parks, Koczur pointed out a number of "waste management" companies. In so doing, it provided Chase with an interesting view as there were large numbers of garbage trucks lined up next to each other.

18

174.  Within days of touring the "waste management" companies in Elizabeth, Chase returned to Los Angeles and immediately began writing the pilot screenplay in which the main character is a mafioso with a front business in "waste management."

175.  His waste management company has been central to the character of Tony Soprano, as well as to the pilot and the series as a whole, throughout the duration of *The Sopranos*.

176.  As Detective Koczur, Chase, and Plaintiff were talking about mob controlled "waste management" companies, Detective Koczur brought up a story that pertained to a "turf war" involving the waste management business.

177.  As far back as the meeting at the Ivy, Plaintiff had suggested to Chase that the project would benefit from the exposition of rivalries within different organized crime groups.

177.  From Plaintiff's days as a prosecutor, he was very much aware of the fact that there were many new groups, typically drawn from particular immigrant groups - Haitians, Jamaicans, Cubans, Russians, Chinese, and many more - that were operating in areas that were formerly dominated by the Italian mob.

179.  Plaintiff clearly recalls telling Chase that the show should include some of the rivalries that came as a result of the emergence of these different groups.

180.  Moreover, the very screenplay Plaintiff submitted to Chase which prompted Chase's interest in Plaintiff dealt in detail with the influx of Chinese organized crime. The screenplay made reference to what, in 1995, was regarded as a possible inundation of the *Triads* when Hong Kong was scheduled to be turned back to China in 1999.

181.  Consequently, Plaintiff was intrigued when Koczur began talking about a homicide that appeared to involve a rivalry between competing mobsters, even though they were both allegedly from the traditional Italian mafia.

182.  The story involved a gangster named Rizzelli who owned a "waste management" company in Elizabeth and was found murdered in the trunk of his car.

183.  It was believed that Rizzelli had been assassinated as a result of a "beef" Rizzelli had with John Figaro, who owned waste management companies on Staten Island.

19

184. Detective Koczur drove Chase and Plaintiff to the location in Elizabeth where Rizzelli's body was found, and then Koczur related the details about the gangland slaying, in which Rizzelli's bullet-riddled body was left in the car.

185. Koczur also told Chase that Rizzelli was said to have given bottles of whisky to various policemen on a number of occasions as "gratuities".

186. Koczur related that, according to rumor, when the police found the body, one of the cops said something to the effect that he wondered if they (the police) would be getting any more whiskey.

187. When Chase heard this he laughed out loud.

188. Afterwards, Chase and Plaintiff discussed the mob "hit." Plaintiff suggested that Chase might incorporate it into the project as a story line.

189. Again Chase did exactly that, writing a story line in the pilot involving a "turf war" between Tony Soprano and a group of gangsters who control another waste management company.

190. Moreover, Chase, in the end, also took Plaintiff's suggestion to make the turf war not exclusively Italian. In the pilot, Tony's rivals are, in fact, Polish. A member of Tony's crew commits the only murder in the pilot episode by murdering one of them inside the Centanni meat market in Elizabeth, a location provided by Plaintiff.

191. Perhaps the single most unique and important location in *The Sopranos* is the pork store.

192. Plaintiff had decided, before Chase's arrival, to take him to see the Centannis meat Market in Elizabeth.

193. Plaintiff had been long aware of suspicions within the Prosecutor's Office that Centannis was connected to the mob activities.

194. Plaintiff suggested to Chase that this place had a good look to it and could work as mob hangout. He asked Koczur to drive Plaintiff and Chase to Centannis.

195. When they arrived, they exited the car and Chase was immediately intrigued with the location.

196. Detective Koczur and Plaintiff explained to Chase the way in which the mafia was alleged to have operated from within the store.

20

197.   Shortly thereafter, Chase wrote the pork store into the pilot script as the mob headquarters.

198.   In 1997, Chase returned to the Centanni Meat Market in Elizabeth and filmed both interior and exterior scenes for the pilot.

199.   When the pilot aired on January 10, 1999, the Centanni Meat Market was specifically named and used.

200.   The streets outside Centannis were also used, as Tony and his uncle Junior and other associates discuss mob business.

201.   Subsequently, to the best of Plaintiff's knowledge, Chase and Centannis failed to agree on terms for continued filming at the store.  Consequently, after the airing of the pilot, the name of the pork store in the series was changed to *Satriale's* and an identical façade was created on the production lot in Queens.

202.   Chase discussed his use of the Centannis Meat Market in an interview with Peter Bogdanavich:

**Bogdanavich**:   *"Now this is a real place, you, you didn't even change the name, did you?"* [Bogdanavich is referring to the name *Centannis* which, he and Chase are viewing in the pilot episode.]

**Chase**:   *"Subsequently in the series we built a different one."*

**Bogdanavich**: *"I notice you imitated the same front."*

**Chase**:   *"Yeah the same front."*

203.   Thus, as Chase concedes, the fictional *Satriale's*, is modeled directly on *Centannis*, which was used in the pilot.

204.   When Chase was asked in the Bogdanavich interview where he got the idea for the pork store he lied.  He told Bogdanavich that his mother used to take him to a pork store when he was a child.

205.   Chase mentioned nothing about the fact that Plaintiff took him to the exact store in Elizabeth that he used in the pilot and which continued under another name through the rest of the series.

206.   The facade of the pork store that Plaintiff brought David Chase to see because Plaintiff thought that it had an interesting look for a mob series, has now become synonymous with *The Sopranos*.

207.   During the lunch at the Ivy, Plaintiff had described for David Chase the North Jersey mafia group known as the Decavalcante family.

208.   Plaintiff mentioned the name of the family boss, John Riggi, who, at the time, was alleged to be running the family from prison.

209.   During their subsequent telephone conversations, Plaintiff again mentioned Riggi's name to Chase in connection with his position as the leader of the Decavalcantes. Plaintiff also referred to Riggi in the notes Plaintiff sent to Chase by Fed Ex., a month after *The Ivy* meeting.

210.   Plaintiff was aware that Riggi, like many mobsters, had made an effort at maintaining a positive perception of himself within, at least, some portion of the community and even the Church.

211.   Plaintiff felt it would be important to have something in the show establishing the relationship between the mob and the Church, so he mentioned this to Chase.

212.   At some point during Chase's visit, Plaintiff asked Detective Koczur, who as previously noted, was raised in Elizabeth, what he could tell them about the mob boss's social and Church standing.

213.   Koczur told Chase and Plaintiff that the Catholic Church had actually built a statue to Riggi's father, Emilio Riggi, and placed in on the grounds at Saint Anthony's Church in Elizabeth.

214.   They then drove to the Church and Koczur pointed out an area where the statue of Emilio Riggi had been built.

215.   Although the statue had been originally set on Church property as a demonstration of the Church's gratitude toward the Riggi family for their help in the construction of Saint Anthony's, it had been moved when parishioners, due to John Riggi's notoriety as "Don" of the Decavalcantes, raised objections.

216.   Plaintiff, Chase and Koczur then walked across the street from the Church where the statute was presently located.

217.   Detective Koczur told this story in detail to Plaintiff and Chase as they stood outside Saint Anthony's in 1995. This was such an interesting story that, during their conversations, Plaintiff suggested to Chase that he incorporate it into the show.

218.   Again, Chase did exactly that. In a scene in the pilot, Tony Soprano brings his daughter, Meadow, into a church, where they sit alone in the pews and

22

Tony laments the passage of time. He points to the workmanship in the Church and tells his daughter that it was their family who had built the Church.

219.   It is a powerful moment in the pilot. Consequently, in a later episode, Tony repeats this to his son, Anthony Jr.

220.   When asked how he came to write this scene, David Chase told Peter Bogdanavich the following: "This comes from my life in that rather late in my mother's life she told me that my grandfather and his brothers had built these churches in Newark."

221.   Again, Chase is lying. Whether or not Chase's mother ever told him the story he claims she did, it is indisputable that this scene was included in the original script and later used in the pilot because Chase was taken to Saint Anthony's where he was told the story about the Church and John Riggi's family just days before he began writing the screenplay.

222.   Plaintiff arranged a meeting with Detective Bobby Jones, a specialist in organized crime investigations, who, as mentioned above, had worked on the MCA case and was among the key players in securing a conviction against Morris Levy.

223.   On October 26, 1995, Chase and Plaintiff met with Jones at Benitos restaurant in Union, New Jersey. During dinner, Jones told Chase the story of his extensive involvement in the MCA investigation.

224.   Detective Jones explained that while conducting a wiretap of members of the Decavalcante crime family, he overheard the mobsters referring to their infiltration of MCA Records. Jones became increasingly interested in the role of Morris Levy, a powerful Jewish gangster who had a long history of swindling recording artists.

225.   Eventually the investigation spread into a federal case where Jones was designated as a federal agent in a supervisory capacity.

226.   He established an office in West Long Branch, New Jersey, from which wiretaps were conducted of a wide variety of Mafioso and their associates.

227.   As a result of the investigation, numerous convictions were secured. Most important, Morris Levy was sentenced to a lengthy prison term and died in jail.

228.   Jones explained in detail to Chase exactly how the MCA scam operated:

23

1) In the MCA case, Morris Levy and his mafia connections arranged to have one of their own people, Sal Pisello, on the inside in the MCA Record Company.

2) Levy then created a dummy corporation under the name of Consultants to World Records.

3) Using Pisello on the inside, Levy was able to divert deliveries of millions of MCA "cutouts" (lesser value recordings) to the front company, which then sold them (or had already sold them before arrival) at bargain rates to the ultimate purchasers of the "cutouts", a number of which, significantly, were Jamaicans.

229.   After dinner at Benitos, Plaintiff and Chase went, as prearranged, to Jones' home in Cranford, New Jersey where they spent several hours listening to some of the actual wiretap recordings of Morris Levy and the various members of the Decavalcante mafia family and associates.

230.   On the tapes Chase heard such mobsters as Tommy "Corky" Vastola, Sonny Brocco, Lew Saka and Morris Levy talking about the MCA scam. Throughout the tapes, they also spoke freely about beating up people, extorting, stealing and various other criminal activities -- all in the most "authentic" Mafioso-style language and tone imaginable.

231.   The tapes are so riveting that at one point a member of the mafia speaks on the telephone with a nationally prominent lawyer in order to arrange a meeting with a well-known United States Senator to have the Senator fix a tax problem.

232.   After hearing the story from Lieutenant Jones and listening to wiretap tapes of conversations between Morris Levy and members of the Decavalcante crime family, Chase returned to Los Angeles and wrote into the pilot screenplay a character virtually identical to Morris Levy whose name is "Lev Morris." Eventually "Lev Morris" would become the character "Hesh" who appears in the pilot and throughout the entire *Sopranos* series.

233.   Herman "Hesh" Rabkin is among the most distinctive characters in *The Sopranos*. Exactly like Morris Levy, "Hesh" is an aging Jewish gangster with a long history of dealing in the record industry.

234.   Although Levy is not Italian, as Detective Jones explained to Chase, he could not become an actual member of the mafia family. Nevertheless, he had enormous power.

24

235.    Hesh's situation is identical.  In fact, Chase even uses the horse farm in the pilot.  Hesh, who had previously been a trusted advisor to Tony Soprano's father, performs a similar role for Tony.

236.    "Hesh" is the one character that Chase has publicly admitted to being roughly based on a real person.

237.    In discussing the origin of the character, Hesh, with Peter Bogdanovich, Chase lied about its conception:

> "I did know that there was a famous '50s record producer who was very tight with, I believe, the Gambino family or one of the New York families.  I was told by someone that knew that if he had been born Italian the record producer would have been a captain in one of the families in New York."

238.    When Plaintiff mentioned Morris Levy to David Chase, he demonstrated no knowledge whatsoever about him.

239.    Indeed, it was Jones and Plaintiff who told Chase about Levy's connection to the Genovese – not the Gambino -- family, and it was Jones who told Chase that if Levy had been Italian he would have been a *capo*.

240.    Jones also explained to Chase how Levy came to be so powerful in the Italian Mafia.  He related to Chase how "Chin" Gigante, the "Don" of New York's Genovese crime family, had a son with psychiatric health problems and that Morris Levy had actually help raise Gigante's son on Levy's horse farm in upstate New York.

241.    During their conversations, Plaintiff suggested to Chase that it would be a good idea to use the horse farm as part of the show.

242.    Immediately after these discussions, a horse farm, owned by the "fictional" character, "Lev Morris," was written into the initial script.  The horse farm remained in the pilot that aired on January 10, 1999, and has continued to be used throughout the series.

243.    This close relationship between Levy and Gigante's child is mirrored in the original pilot script by the relationship between "Lev Morris" and "Tommy" Soprano's daughter, Meadow, where one of the minor story lines is about Meadow's upcoming trip to California with "Lev" to attend the MTV awards.

244.    The story line runs throughout the script as her mother tells her that as punishment for having bad grades, she will not be allowed to go to the MTV

25

awards. Meadow, who is very excited about the trip, is crushed and appeals to her father.

245.     Later Chase kept the story line but changed the character having this relationship with Meadow.

246.   Plaintiff had previously suggested the idea of basing a story line on the scam utilized by the mob in the MCA case.

247.   Plaintiff mentioned this to Chase in an early phone conversation and gave a brief sketch of the scam in the notes Plaintiff sent him in July of 1995.

248.   As mentioned, during the trip, Plaintiff had asked Detective Jones' to provide Chase with a more detailed explanation of how these scams operate.  Jones did so, and Chase wrote exactly the same scheme into the pilot script, using the character named "Spiros" who is unable to pay the interest on his loan:

> a)     Junior tells Spiros that he has an idea for a scam in which Spiros will arrange to *"divert a couple million miles to a dummy account that we set up."*

> b)     Junior explains: *"We cash 'em for a couple thousand coach seats which we sell to the Jamaicans for eighty, ninety bucks apiece to fly home for the holidays."*

> c)     Spiros tells Junior that he would *"need someone inside the airline to do that"* -- just as the mafia had Sal Pisello inside MCA Records.

250.     In MCA's case, the record company diverted millions of "cut-outs," whereas in Junior's scheme the Airline will divert millions of frequent flier miles, but in both versions, the cut-outs or flight tickets are then sold at bargain rates.

251.     Chase's mob scam is not only identical to the scam operated by Morris Levy, it even has the same consumer in mind as Junior Soprano tells Spiros that the tickets can be sold to "the Jamaicans."  Jones had explained to Chase that many of the MCA cut-outs were diverted to Jamaican buyers, and there is even a reference to Jamaicans on the wiretap tapes that Chase heard.

252.     During the lunch with Detective Koczur and Tony Spirito, Chase also learned about the existence of a Mafioso known as "Little Pussy" Russo.

253.     Tony Spirito told a story about being a child on a trip to the New Jersey shore with his family when their car was stopped by a policeman for a

26

traffic violation.  Tony recalled his father telling the officer that he knew "Little Pussy" and that they should call "Little Pussy," who allegedly had influence within the particular police department.

254.     When Tony Spirito told this story everyone, including Chase, was extremely amused by the nickname, "Little Pussy".

255.   The next day at dinner with Detective Jones, after Plaintiff asked Jones if he could tell us anything about "Little Pussy" Russo, Detective Jones responded that he was very familiar with the activities of "Little Pussy" Russo because, coincidently, "Little Pussy's" office, where he had run mob activities on the New Jersey Shore, was located immediately behind Jones' Office in West Long Branch where Jones was conducting his wiretapping of Morris Levy and the Decavalcante Family.

256.   In fact, "Little Pussy" Russo was murdered in 1979 in a motel about a mile from Jones' Office in West Long Branch where Jones worked on the Levy investigation in the 1980s.

257.   Detective Jones was very familiar with the Russo murder and explained to Chase that it was believed within the law enforcement community that it was an "inside job."  Mafia leaders suspected that "Little Pussy" had turned on them and was cooperating with federal authorities.  This caused the mafia to eventually have "Little Pussy" killed.

258.   Jones also told Chase that Russo had a lesser known brother with the nickname, "Big Pussy", and explained that the brothers got their nicknames years before because they had been notorious cat burglars.

259.   After hearing about "Little Pussy" Russo from Tony Spirito and then from Detective Jones, Chase began writing the original pilot script that included a character named "Little Pussy" who, like the real "Little Pussy" Russo lived at the New Jersey Shore (Deal Beach in Chase's original pilot script of 1995) and is suspected by Tony's uncle of being a "rat".

260.   Chase and Plaintiff discussed the story afterwards and Plaintiff suggested that Chase model a character on "Pussy" Russo.

261.   Once more, Chase did exactly that, as one of the principle story lines of the pilot episode revolves around the fact that Tony's uncle plans to kill "Little Pussy." He wants to commit the murder in a restaurant owned by one of Tony Soprano's friends.

27

262. Tony is afraid that this will damage his friend's business and spends much of the episode trying to figure out how to avoid this, including soliciting the advice of "Lev Morris".

263. Eventually, Tony, himself, has his friend's restaurant blown up, hoping that the friend will be able to collect the insurance.

264. A second character, "Big Pussy" Bonpensiero is also introduced in the pilot.

265. "Big Pussy" is a Member of Tony's crew and, like "Little Pussy" he is also eventually suspected of becoming a "rat".

266. The story involving "Big Pussy's" allegedly turning on the mob is drawn out over several seasons until he, too, is finally killed.

267. Chase was asked about the origin of these characters by Peter Bogdanovich:

**Bogdanavich**: *"And where does a name like Big Pussy - to distinguish him from Little Pussy - come from?"*
**Chase**:   *"I had heard there were in New Jersey in the '40s, I think, two gangsters, Little Pussy and Big Pussy and once I heard that - that became like Fort Knox.  I wasn't going to let that secret out.  I had to use that."*

268. Once again, David Chase's response to Bogdanavich is contrived and deliberately false.  Chase knows exactly where he got those names and the stories that went along with them.

269. The poultry market in Newark where Tony Spirito received his loan shark money was located next to a topless bar.

270. Both Plaintiff and Detective Koczur casually mentioned to Chase that these kinds of places are often hangouts for members of organized crime.

271. The three entered the bar and each had a beer.  Afterwards, Plaintiff suggested to Chase that he should include a similar place in the show.

272. Within days of sitting in this topless bar, having a beer, and discussing the fact that such places – including the one they were sitting in -- are common mob hangouts, Chase included in the pilot script a topless bar in Newark as a mob hangout.  It was while watching television at the bar that one of Tommy Soprano's crew sees that "Little Pussy" Malanga has arrived back in town at Newark International Airport.

273. Later the original topless bar was expanded into the "Bada Bing".

274.    David Chase, in a discussion with Peter Bogdanavich, never mentioned the this original topless bar. Instead he says that the idea of such a club came from Steve Van Zant, a member of Bruce Springsteen's *E Street Band,* came to play a character in *The Sopranos.* Chase explains that Van Zant had written "a screenplay about a guy named Silvio Dante who owned a club in Atlantic City."

275.    Chase concludes, "So I guess that's how the Bada Bing came to be." Chase knows that is false. He never mentions that Plaintiff and Detective Koczur took Chase to a topless bar in Newark and explained its connection to the mob immediately before Chase wrote what a Newark topless bar into the pilot script.

276.    On March 5, 2001, David Chase was interviewed by journalist George Will on ABC's *This Week,* where the following exchange took place:

**George Will**:    *The FBI supposedly has tapes of real Northern New Jersey mobsters talking about The Sopranos scenes. Marvelously authentic. How do you research this? How do you research a mob movie?*

**David Chase**:    *There's one particular gentleman in law enforcement that we talk to who                knows quite a bit about it.*

277.    In Defendant's Answer to the Plaintiff's Complaint, he denies that, when making this comment to George Will, he was referring to Plaintiff or Plaintiff's friends and associates. Instead, he now claims that he was referring to the show's eventual technical consultant, Daniel Castleman, who, apparently accepted money for consulting on *The Sopranos* while working as the head of the Organized Crime Unit at the Manhattan D.A.'s Office.

278.    Chase, again, is lying. He had absolutely no contact or dealings with Castleman until over a year after the original pilot was written. Castleman had absolutely nothing to do with the creation of *The Sopranos* and played an insignificant role in developing the pilot.

279.    The FBI tapes that George Will refers to in his question to Chase do, in fact, exist. On these wiretap tapes several members of the Decavalcante crime family can be heard talking about their belief that *The Sopranos* is about them.

280.    At the Ivy Restaurant, over five years before these tapes were made, Plaintiff told Chase about the Decavalcante crime family in North Jersey, but understandably, Chase, who knew little about the mafia, had never heard of them.

281.    From the very beginning, it was Plaintiff's suggestion that the pilot be modeled, to some degree, on the Decavalcantes.

29

282. This was one of the reasons why Plaintiff was so pleased to have lined up Tony Spirito -- who literally cooked meals for John Riggi the former "Don" of the Decavalcantes while Riggi was in prison -- and Detective Jones who had investigated them and possessed wiretap tapes of the Decavalcante crime family from the 1980s.

293. Thus, in 1995, Jones and Plaintiff provided Chase with the unique opportunity to sit for several hours listening to wiretap recordings of the very same mafia family that George Will referred to in his question.

294. In fact, one of the mobsters heard by David Chase on those tapes was Decavalcante member, Tommy "Corky" Vastola, who is one of the mobstered referred to in the later FBI tapes.

295. Indeed, in the more recent tapes -- those referred to by George Will -- Decavalcante members say that a particular *Sopranos* episode was about "Corky" – a reference to "Corky" Vastola.

296. David Chase never lied to George Will.  He never told him that he had actually listened to a wiretap recording of this very same "Corky" – or any other mobster - - just days before he began writing the pilot script.

297. During many hours at the home of Detective Jones in Cranford (Chase and Plaintiff left Jones' house around 3 a.m.), New Jersey in late October of 1995, Chase listened intently to these extraordinary tapes of the Decavalcante crime family and, as he did throughout his visit, took copious notes the entire time.

298. Chase then returned to Los Angeles where he spent the next five weeks, armed with his notes of the Decavalcantes on tape, writing a screenplay that reflected much of the authenticity he heard from the mouths of the mobsters themselves. But when asked by George Will how he researched the show, he said he knows someone in law enforcement – now revealed as Daniel Castleman.   But, Castleman was not even known to Chase until over a year and a half after Chase and Plaintiff actually began researching for the show and long after the original pilot screenplay – which is almost identical to the final pilot script – was written.

299. In addition to the meetings in and around the Elizabeth-Newark area, Plaintiff also felt it would be useful for Chase to understand something about other mob activities throughout the State of New Jersey.

300. Plaintiff arranged a dinner in Atlantic City on October 26, 1995 with Detective Joseph Khoury, then recently retired from the Atlantic County Prosecutor's Office.

30

301. Detective Khoury was one of the principal investigators of Philadelphia's notorious Bruno crime family.

302. His work was critical to turning an informant named Joe Salerno which ultimately led to the arrest and conviction of Nicky Scarfo in what has been described as the largest mob takedown in United States history.

303. The story of Salerno's turn against the mob is told in a book, *The Plumber*, in which Joe Khoury's involvement is described.

304. Chase and Plaintiff drove to Atlantic City and during a lengthy dinner with Detective Khoury and his wife, Khoury provided Chase with details about his investigation into the Bruno family, the infiltration of the crime family into the casinos in Atlantic City and the manner in which the mafia operated there.

305. Plaintiff also felt it would be helpful for Chase to develop an understanding of how organized crime operated on the New Jersey waterfront.

306. Plaintiff arranged a meeting with Detective Richard Wisnewski, the head of the Organized Crime Unit in the Hudson County Prosecutor's Office. For several hours Detective Wisnewski described the operations of the mob on the waterfront and gave Chase an overview of the history of organized crime in that area.

307. In an effort to provide Chase with a sense of the possibilities of shooting film in North Jersey, where, according to Chase, he had not spent any substantial time in the previous twenty-five years, and, particularly, in the city of Elizabeth which Chase had never before entered, Plaintiff arranged two different tours with Detective Koczur.

308. Plaintiff and Detective Koczur took Chase to the Centannis Meat Market, Saint Anthony's Church in Elizabeth, and the poultry market and topless bar in Newark.

309. Additionally, Detective Koczur and Plaintiff drove Chase through the area of the Elizabeth's chemical plants, which are seen in the opening sequence of *The Sopranos*.

310. Detective Koczur and Plaintiff drove Chase through a remote area of Elizabeth in order to show him a view of Elizabeth's Exxon oil refineries, which are used in the opening sequence of *The Sopranos*.

311. Detective Koczur and Plaintiff drove David Chase to an area alongside the Goethels Bridge that connects Elizabeth to Staten Island, which is seen in the opening sequence of *The Sopranos*.

312. Detective Koczur and Plaintiff drove Chase to a remote area of Elizabeth's waterfront to see the Clifton Street Bridge, an obsolete railroad bridge, in an abandoned site near the Arthur Kill River, and either this bridge or one identical to it is seen in the opening sequence of *The Sopranos.*

313. Detective Koczur and Plaintiff drove David Chase to Liberty State Park in Jersey City, New Jersey.

314. Plaintiff particularly wanted David Chase to see the extraordinary view of the Statue of Liberty from that location, which Plaintiff had become familiar with during Plaintiff's two years working in the Hudson County Prosecutor's Office in Jersey City, New Jersey.

315. The exact same view appears in the opening sequence that plays at the start of every *Sopranos* episode.

316. By the use of skilled camera-work it seems as though Tony Soprano is looking at the Statue of Liberty from his car on the New Jersey Turnpike, but it is impossible to view the Statue of Liberty from that location on the Turnpike.

317. The shot is actually taken from the area of Liberty State Park where Detective Koczur and Plaintiff brought David Chase specifically to look at that view of the Statue.

318. Koczur and Plaintiff drove Chase past the Pulaski Skyway, which was first mentioned as an interesting North Jersey setting at *The Ivy* Restaurant, as it was initially brought up by Joe Urbanczyk, who was born in Jersey City and drove over the Pulaski Skyway many hundreds of times.

319. Urbanczyk is a highly experienced cameraman with an eye for locations, who has mentioned to Plaintiff numerous other times that the Pulaski Skyway is an extraordinary cinematic setting.

320. Just as it was no surprise to Plaintiff when Urbanczyk brought it up at *The Ivy*, it was also no surprise to Plaintiff that there were several shots of the Pulaski Skyway in the opening sequence of every show as well as a shot of the Pulaski Skyway with the name "Chase Films" superimposed on it.

321. Koczur and Plaintiff drove Chase numerous times past Minolos Restaurant in Elizabeth, which was used as an interior in the pilot episode.

322. Detective Koczur and Plaintiff drove David Chase through Elizabeth's industrial park, an area consisting of a large number of old industrial buildings --

one of which was the location where Koczur pointed out the waste management companies.

323.     As they drove through the industrial complex, Chase was visibly ecstatic over the locations, and it was during his time in the industrial park with Detective Koczur and Plaintiff, that Chase emphatically stated that he wanted to come back and shoot the show in Elizabeth.

324.     Plaintiff took Chase through the Meadowlands on the way to and from the Hudson County Prosecutor's Office in Jersey City.

325.     When Plaintiff worked in the Hudson County Prosecutor's Office, he lived in an apartment located where Route 7 comes out of the Meadowlands into Kearny, so he wanted Chase to see this unusual route that goes straight through the Meadowlands, where eventually a scene in the pilot episode was shot at a garbage site on this route.

326.     Plaintiff also drove him along Ridge road which has an extraordinary view of the Meadowlands, where they stopped along the way to get out and look at this tremendously photogenic area.

327.     The opening sequence that plays before every episode of *The Sopranos* uses the name of only one city, town, or municipality of any kind in the entire world and that appears in the form of a road sign -- seen from the New Jersey Turnpike - which reads "Elizabeth".

328.     Detective Koczur and Plaintiff drove David Chase past that sign several times, and that sign is seen in all *Sopranos* episodes.

329.     It is significant that the opening sequence of the show follows Tony Soprano taking a fictional route from New York City to his home in North Caldwell.

330.  If a person were traveling from New York City to North Caldwell, he would go nowhere near Elizabeth and would never even come close to passing the sign shown in the opening sequence.

331.  The obvious reason for Tony Soprano taking this circuitous path is to emphasize the centrality of Elizabeth, by showing the sign and then showing many locations in Elizabeth and nearby in Newark, most of which were originally shown to Chase by Detective Koczur and Plaintiff.

332.  Chase even included Plaintiff's home community, Packanack Lake, in the original pilot script, dated December 6, 1995, where there is a scene in which a group of

33

mobsters are playing golf while discussing business at a golf course set at "The Packanack Country Club", and in the dialogue one of the mobsters talks about arranging a "sit down" at "the Packanack Country Club."

333.  David Chase told reporter Charles Austin that he "barely knows" Plaintiff, yet one of the scenes in the Pilot, drafted immediately after he spent three days with Plaintiff developing the show, is set in Plaintiff's small home community-- Packanack Lake in Wayne, New Jersey-- where both Joe Urbanczyk and Plaintiff were raised, and where Plaintiff has lived most of his life, including now, and the period of time when he worked with Chase.

334.  Chase had never heard of Packanack until meeting Urbanczyk on the set of the Rockford Files.

335.  At first he thought Urbanczyk meant to say that he lived in a town named Pequannock, which is close to Wayne but actually is located in another County.

336.  Through the next six months, Chase heard a great deal more about Packanack from both Urbanczyk and Plaintiff, and he decided to include it in the original 1995 pilot script.

337.  Packanack was used in the original pilot script solely because of Chase's extensive relationship with Plaintiff and Joe Urbanczyk -- relationships that he has essentially denied.

338.  Not surprisingly, by the time the show aired in January of 1999, the name of the Golf Course had changed as Chase attempted to remove any trace of Plaintiff's involvement in the project.

339.  From the moment Plaintiff suggested the idea of a show about the North Jersey mafia until after Chase left New Jersey to write the pilot script, Chase and Plaintiff talked many times, often at great length, about the Decavalcante crime family.

340.  Most of the people they met and places they went to had some kind of connection to the Decavalcantes.

341.  On the other hand, they never once spoke about the Boriardos, as Chase never mentioned them, nor did Plaintiff.

342.  The only time there was any reference to a Boriardo was at *The Madrid* when Tony Spirito spontaneously noted that he knew Richie "the boot" Boriardo.

34

343.    The idea, as Chase now claims, th at this show was "very loosely based" on the Boriardo crew is pure fiction.

344.   Plaintiff is also unaware of Chase relying on anyone other than the Plaintiff's services  and the meetings with Plaintiff's associates for ideas, information, stories, or material of any kind about the North Jersey mafia during the creation and development of the show.  The show's paid consultant, Daniel Castleman, was not involved with the show when it was being created and he no role whatsoever in anything having to do with the conception and development of the pilot script, and this was all done long before Castleman ever started double-dipping into *The Sopranos* billions while somehow still heading up an Organized Crime Unit in the Manhattan D.A.'s Unit.

345.    Chase has put forward the fact that Castleman, at his own request, does not receive screen credit for his consulting as if to highlight his modesty. The real reason, of course, is that it is such a flagrant conflict of interest, as it would not be allowed in any Prosecutor's Office in New Jersey, and it's hard to imagine how it's allowed in New York.   That situation, however, has now dramatically changed.  Castleman has not only received screen credit, but a highly unusual sought after single-card screen credit.

346.    When the trip ended, Defendant again discussed compensation with Plaintiff, which was again resolved in accordance with the parties' longstanding and repeated oral agreement.

347.    Both parties agreed that this was the most appropriate arrangement, as Defendant acknowledged that the amount Defendant could afford to pay Plaintiff at the time, could not even have remotely compensated Plaintiff for the value of his expertise, contribution, and services.

348.    When the final day of the development trip was ending, Chase, who now had filled his book with notes, said to Plaintiff: "I have what I need; now it's up to me to go back and write it."

349.    Before Plaintiff and Chase separated in the early morning of October 28, 1995, Chase was so overwhelmed by the value of Plaintiff's assistance, that Chase's final words to Plaintiff before returning to California were, "I don't know how I can ever repay you."

350.    On October 28, 1995, Chase flew back to Los Angeles to immediately write the screenplay.  He completed the first draft, which is dated December 6, 1995, within just five weeks.

351.     A copy of the second draft for *The Sopranos* pilot episode, dated December 20, 1995, was sent to Plaintiff by Chase for Plaintiff's review and opinion.

352.     After reading it, Plaintiff spoke with Chase on the telephone and responded with extensive comments both over the phone and later in writing.

353.     Over the next year, Chase and Plaintiff spoke numerous times by telephone.

354.     Plaintiff can remember at least four conversations with Chase, but there may well have been more.

355.     On one occasion, Chase called and asked if he could speak directly with Detective Jones about something.

356.     Plaintiff agreed and supplied him with Jones' telephone number. Plaintiff has been told by Detective Jones that he was never contacted by Chase.

357.     On another occasion, Plaintiff called him because Detective Joe Khoury told Plaintiff that Chase had not yet returned a book Chase had borrowed from him.

358.     On another occasion, Chase valued Plaintiff's expertise so highly, that he even called Plaintiff late one evening to seek Plaintiff's advice when Chase's friend had been sexually assaulted in New Orleans, and Chase was concerned that the police were not doing an adequate investigation.

359.     Plaintiff spent well over an hour on the phone detailing exactly what the police should do in such an investigation, thus allowing Chase to better assess the situation involving his friend.

360.     Plaintiff later spoke with Chase about another manuscript that Plaintiff had written.

361.     Each time they spoke, they also talked about the *Sopranos* script.

362.     During those conversations, Chase was usually pessimistic and depressed, as the script was being rejected by all the networks. This occurred, as Chase has explained, when he "pitched the concept for *The Sopranos* around town with no luck"; and was told, "Mob comedy? So long."

363.     Plaintiff continued to encourage Chase to keep trying to get it sold, and bolstered Chase's sagging spirits, by urging him to continue pursuing the project, and reassuring him that, in time, he would prevail.

364.     Plaintiff also sent Chase a letter dated February 10, 1997, discussing the *Sopranos* script prior to making a trip to Los Angeles.

365.     After sending the letter, Plaintiff spoke with Chase's assistant, Kelly Koczak, who confirmed that Chase had received it.

366.     The critique in this letter was Plaintiff's final service to Chase.

369.     When Chase finally sold the concept, he ceased all contact with Plaintiff.

370.     Plaintiff heard nothing from Chase, and nothing about *The Sopranos*, from February of 2007 until July of 2008.  At that time, Plaintiff received an embarrassing phone call from Detective Koczur in Elizabeth, New Jersey. Koczur told Plaintiff that the pilot for *The Sopranos* was being filmed in Elizabeth by Chase.

371.     Plaintiff was absolutely stunned by this disclosure.  He found it inconceivable that Chase never even bothered to contact him to let him know, not only that the show was being filmed, but that Chase had returned to the very locations which Plaintiff had suggested to him and brought him to.

372.     Notwithstanding this extraordinary slight, Plaintiff, based upon his perception that theirs was a relationship of trust and confidence, continued to believe that Chase would be in touch with him.  Plaintiff was mistaken.

373.     On January 10, 1999, *The Sopranos* premiered on HBO.

374.     The show became the "hottest show on television", winning multiple Emmys and Golden Globes, while being dubbed "the crime show of the century", "a virtual masterpiece", "a cultural phenomenon", and part of "the American people's lexicon".

375.     *TV GUIDE* has ranked *The Sopranos* as the fifth greatest show in the entire history of television, surpassed only by *All in the Family*, *The Honeymooners*, *I Love Lucy*, and *Seinfeld*.

376.     After seven seasons, the colossal success of *The Sopranos* has brought untold wealth, fame, and prestige to Chase.

37

377.   Known as "the master cylinder", "the show's creative capo", and "the mastermind behind *The Sopranos*", Defendant Chase "can't go to any industry function without getting buttonholed by actors looking to do a guest shot."

377.   Plaintiff, through Joe Urbanczyk, tried to contact Chase after the show aired, but Chase never responded.

378.   Plaintiff later sent Chase a congratulatory letter, hoping to initiate some communication and asking to come on one of the sets.   Chase never responded.

380.   As soon as Chase felt he no longer had use for Plaintiff, Chase ceased all communication with Plaintiff.

381.   In an interview with *Entertainment Weekly*, Chase explained that the show's authentic sounding behaviors and expressions are culled partly from "hearing things from people who know people".

382.   These "people who know people" cannot be a reference to anyone other than Plaintiff.  From the meeting at *The Ivy* in June of 1995 until the sale of the completed script to HBO in February of 1997, Chase made no development trip for *The Sopranos*, other than the October, 1995 trip arranged by Plaintiff. There were, moreover, no other persons associated with law enforcement, law, crime, organized crime or any related field with whom Chase consulted prior to the final sale of *The Sopranos* screenplay to HBO.  Plaintiff was Chase's sole consultant throughout the creation and development of *The Sopranos*.

**B. Plaintiff intends to prove the following contested facts with regard to damages. (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

*Compensatory Damages*

1.Plaintiff   incorporates by reference all contested facts on liability as the basis for Plaintiff's compensatory damages claims, as same are interrelated.

2.The   services provided by Plaintiff to Chase have significant compensable value within the television industry.

3.Plaintiff   deserves remuneration and acknowledgment for his contributions to both the pilot episode of *The Sopranos* (the sales tool for a potential series which establishes the premises, introduces the cast, and sets forth story lines that will be followed if a series is ordered), and the continuing series.

4. The   Pilot sets forth the framework (the template)–the settings, themes, premises, visual elements and general story line(s) -- which framework is intended to be repeated in each episode.

5. The   Sopranos episodes beyond the Pilot clearly follow the pattern of characters introduced in the Pilot, as well as the themes, the storylines, the settings, the visual elements, and the interplay of all these as suggested for use in the Pilot, making the Pilot a critical component of the series, and an extremely important step in the creation and production of a successful television series.

6. There   exists a reasonable manner to calculate the value of Plaintiff's contribution in accordance with industry standards within the television business.

7. Plaintiff   provided services that would typically be provided by a "consultant" in the television industry.

8.   Plaintiff provided services that would typically be provided by a location manager and a location scout.

9.   Plaintiff provided services that would typically be provided by a technical consultant;

10. Plaintiff provided services that would typically be provided by a creative consultant and/or co-creator of a show.

11. Plaintiff assisted Chase by educating him about the New Jersey mafia and the mafia in general.

12.   Plaintiff provided Chase with access to key individuals possessing knowledge on the subjects pertinent to the project.  These people shared with Chase stories, information, and personal experiences relating to the North Jersey mafia.

12. Plaintiff assisted Chase by finding various locations where the show could be filmed.

13. Plaintiff provided Chase with access to individuals who found various locations where the show could be filmed,

14. Plaintiff assisted Chase by guiding him through the exploration of the world of organized crime and discussing the subject in great detail while providing him with information and stories relating to the North Jersey mafia.

15. Plaintiff made suggestions and advice to Chase relating to themes, characters and stories appropriate for use in the show.

16. Plaintiff assisted Chase by providing him with comments and critiques, both verbally and in writing regarding the initial draft of the pilot script.

17. Plaintiff assisted Chase by answering questions, conducting research, and providing information concerning crime, criminal syndicates and the law.

18. It is customary in the television industry to refer to an individual who performs these kind of multiple services performed by Plaintiff, as, at a minimum, a "consultant."

19. A "consultant" within the television industry would typically be an individual who works with the creator/producer of a show in facilitating the creator/producer's access to the world that is the subject of the show, specifically providing access to the people, places and information that the creator needs in order to produce the pilot episode and/or the subsequent episodes.

20. For example, a creator/producer who wished to develop a show dealing with the operations of the Federal Bureau of Investigation (FBI) would ordinarily hire a consultant.

21. The consultant in such a scenario would assist the creator in a variety of ways. The consultant might:

> a)    provide the creator with access to members, or former members, of the FBI who could provide information, stories and personal experiences about the FBI.

> b)    find locations that would be important in a show about the FBI.

> c)    provide the creator/producer with both general background and operational information about the FBI.

> d)    work as a liaison between the creator and his various contacts, typically persuading those individuals to elaborate on information already provided by the consultant, adding to it from their own knowledge and experience.

> e)    be available to respond to questions and provide any assistance that the creator needs, in short, providing the creator/producer with access to the world of the FBI.

40

22. Such services are, of course, extremely valuable, particularly so at the outset of a project.

23. There are many producers and creators who will not begin a project without first hiring a consultant.

24. Plaintiff performed such consulting services for *The Sopranos*.

25. There is a long history in the television industry of compensating those who have rendered services similar to the services rendered by Plaintiff.

25. A consultant who performs such services in the industry is typically compensated by salary.

26. If the resulting Pilot episode is purchased by a network, a consultant who performed such services, would ordinarily receive a production bonus.

27. In addition, it would be customary to award a consultant who performs extremely valuable services with a screen credit.

28. This, in fact, has happened on *The Sopranos,* where a technical consultant, who provided far less valuable services than did Plaintiff, has been rewarded with an unusual single card credit.

29. Such highly sought credits have significant financial value.

30.   The salary received by a particular consultant would vary depending upon the anticipated value of the consultant's services.

31. The factors to be considered would be the consultant's background and experience, and, more important, the consultant's unique ability to provide access into the world that is the subject of the project.

32. A consultant who performed services similar to those performed by Plaintiff would customarily receive a negotiated salary, which would usually be arranged as weekly payments up to a pre-set amount.

33. It would have been customary for such a salary in 1995 to be have been about $5,000.00 per week.

34. A set maximum figure would have been within a range of about $50,000.00 to $100,000.00.

41

35. Plaintiff's services began in late June of 1995 and his final service occurred in February of 1997.

36. While it is true that most of Plaintiff's services were completed by the end of October 1995, it is, nevertheless, also true that he continued to have contact with Chase during which they discussed the project, Plaintiff provided verbal comments regarding the script sent to him by Chase, encouraged Chase to continue trying to market the project even after it had been rejected multiple times and he his final service was the provision of a written critique of the script in February of 1997, just as Chase was about to make final revisions for production.

37. In addition, Plaintiff was available at all times to assist Chase throughout the entire period from June of 1995 to February of 1997.

38. Plaintiff acted, at a minimum, in the capacity of a consultant for a period of nearly twenty months.

39. Plaintiff's contributions to *The Sopranos* were more than those of a traditional consultant, such as those concerned with technical matters. His contributions can be characterized as a higher level of services such as those provided by a co-creator.

40. Consequently, in Plaintiff's case, the services he provided would tend to fall toward the higher end of the range of compensation.

41. The fair market value of Plaintiff's services as a consultant – excluding the value of the ideas he contributed and the aggregating of those ideas – would be approximately $100,000.00.

42. In addition, a consultant who performed services similar to those performed by Plaintiff would customarily receive a production bonus when the project is ordered to series.

43. Such a bonus would also vary depending on the value of the services provided.

44. It would be within industry standards for such a bonus to be within a range of 25% to 50% of the consultant's salary. In Plaintiff's case that would be between $25,000.00 and $50,000.00.

45. Considering the higher value of the contributions made by Plaintiff that bonus would tend to fall toward the upper end of that scale.

46. It is, thus, within industry standards for a consultant who performed the kind of services provided by Plaintiff to receive a production bonus of $50,000.00.

47. An individual who performed the services that Plaintiff performed for Chase would have been compensated by a salary of approximately $100,000.00 and a production bonus of $50,000.00.

48. This compensation is within the standards for remuneration of similar consultants within the television industry and reflects the fair market value of Plaintiff's services at the time his services were performed.

49. Prior to October 24, 1995, Plaintiff spent approximately 35 to 40 hours in connection with providing services to David Chase.

50. Plaintiff spent approximately 3 to 5 hours talking with Chase on the telephone from their first conversation subsequent to the meeting at the Ivy up until his arrival in New Jersey.

51. Plaintiff spent approximately 25 to 30 hours talking to and meeting with others in arranging for Chase's trip to New Jersey.

52. Plaintiff spent approximately 3 to 5 hours researching material about the North Jersey mafia.

53. There were many other hours spent talking to friends and family members about the project as well as just thinking about it, but it is impossible to accurately calculate that time.

54. On the three day development trip to New Jersey over October 24, 25, 26, 1995, Plaintiff spent approximately 15 hours per day over 3 days with Chase.

55. After to October 26, 1995, Plaintiff spent approximately 10 to 15 hours in connection with providing services to David Chase – 2 to 3 hours talking on the phone with Chase; 4 to 6 hours reading the pilot script; 4 to 6 hours writing the critique of the pilot script.

***Punitive Damages***

1. Plaintiff    incorporates by reference all contested facts on liability and compensatory damages as the basis for Plaintiff's punitive damages claims, as same are interrelated.

2. Were it for not for Plaintiff's enormous, but *uncompensated* efforts, it is a virtual certainty that the cultural icon known as *The Sopranos* would have never come to fruition, for it was Plaintiff, among other things:

> a. who in June, 1995, introduced Defendant Chase to the concept of doing a crime show about the Mafia based in New Jersey; during a time when in Chase's own words, he "pitched the concept for *The Sopranos* around town with no luck", and was told, "Mob comedy? So long.";

b. who engaged in scores of ongoing phone conversations and meetings with Defendant Chase, for purposes of educating Defendant Chase about crime, criminal syndicates, the law, law enforcement, and most importantly, organized crime in New Jersey;

> c. who introduced Defendant Chase to a multitude of diverse experts on these various topics, whose knowledge was instrumental in the genesis of *The Sopranos*, and whom Defendant Chase would never have met but for Plaintiff's efforts and reputation;

> d. whose opinion Defendant Chase sought in connection with the first draft of the script for *The Sopranos* pilot episode, and who provided Chase with an ample critique both over the phone and in writing.

3. Plaintiff and Defendant entered into an oral agreement based upon the supposition that if *The Sopranos* succeeded, then Plaintiff would be appropriately compensated for his role in the creation of the show.

4. In acknowledgment of Plaintiff's gargantuan efforts, Chase told Plaintiff, at the close of the development trip: "I have everything I need, now it's up to me to go back and write it."

5. When Chase needed Plaintiff, Chase expressed his immense gratitude toward Plaintiff. The last words spoken by Chase to Plaintiff as he left New Jersey were: "I don't know how I could ever repay you."

6. Yet despite this fully warranted expression of appreciation and gratitude for services that would prove to be invaluable, Chase's commitment to Plaintiff proved transparent. Once Chase got what he needed from Plaintiff, he did not even try to repay him.

7. Instead, Chase has deliberately excluded Plaintiff, while the colossal success of *The Sopranos* has brought Chase untold wealth, fame, and prestige.

44

8.Rather   than hearing directly from Chase about the advent of *The Sopranos*, Plaintiff received an embarrassing phone call from an associate in Elizabeth, New Jersey, disclosing that the pilot for *The Sopranos* was already being filmed there.

9.     Once the pilot aired on January 10, 1999, Plaintiff attempted to contact Defendant Chase through their mutual friend, Joseph Urbanczyk, but to no avail.

10. Later, Plaintiff again attempted to contact Chase with a congratulatory letter, but Chase never responded.

11.     Shortly after this suit was filed, Chase told reporter Charles Austin that he "barely knew" Plaintiff. He also denied to The Bergen Record that he spent days with Plaintiff in New Jersey.  Chase's counsel later told the Court in a letter that Plaintiff's lies were the result of being "caught off guard."

12. Chase described Plaintiff's claims to having contributed to the creation and development of the *Sopranos* as the product of "ego-centric fantasies".

13.     Thus, when it was important to Chase, he had no trouble reaching out for Plaintiff's valuable counsel and acknowledging that value, but once Chase had what he needed, and *The Sopranos* became a tremendous success, Plaintiff's presence became an inconvenience if not an embarrassment for Chase whose treasured status as the "creative guru" of *The Sopranos*, might, in his very calculated thinking, be undermined. Consequently, Chase not only reneged on his legal obligation to compensate Plaintiff, in the wake of all his incalculable profit and success, he never even called Plaintiff to say "thanks".

14. Chase has, thus, never attempted to credit Plaintiff in any way for his extensive contributions--contributions that paved the way for the ascent of *The Sopranos*, and Chase's enormous financial and professional success.  And while there is no legal obligation, Chase has never once publicly credited any of the other people who were so central to the creation and development of *The Sopranos*, including Detective Tom Koczur, Detective Bobby Jones, Detective Joseph Khoury, Detective Richard Wisnewski, Tony Spirito and Joseph Urbanczyk. He has, moreover, reneged on direct promises made to some of these people, including a promise to Detective Koczur that he would head any security detail if the show was ever shot in Elizabeth and a promise to Detective Jones that he would have a "walk-on" in an episode if the show was ever produced.  There was also a promise made to Tony Spirito that he would be considered for a small part in the show.  When the show first aired in January of 1999, Tony Spirito called Chase repeatedly and Chase never responded.  Chase's complete contempt for the moral obligations he owes to these other people is no different than the contempt he has for the legal obligations he owes to Plaintiff.